THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANGELA BUTLER, Defendant-Appellant.

First District (5th Division) No. 1—97—1633

Opinion filed March 31, 1999.

HOURIHANE, P.J., concurring in part and dissenting in part.

Rita A. Fry, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Arleen C. Anderson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE THEIS delivered the opinion of the court:

Following a bench trial, defendant Angela Butler was found guilty of possession of a controlled substance with intent to deliver (720 ILCS 570/401 (West 1996)) and sentenced to 15 years' imprisonment. On appeal, defendant argues that (1) the evidence was not sufficient to establish that she knowingly possessed a controlled substance; (2) the circuit court relied on an inaccurate recollection of evidence in its guilty finding; (3) her sixth amendment right was violated when the court precluded her from calling a witness; (4) she was denied a fair trial because the prosecutor misstated evidence during his closing argument; and (5) it was error to include the noncocaine portion of the solvent containing cocaine to calculate the weight of the contraband. We affirm.

On June 5, 1996, defendant was returning from a trip to Jamaica when she was stopped and questioned as she went through customs at O'Hare airport. Nothing was discovered from a pat-down search. However, the field test on the liquid in the bottles she was carrying was positive for cocaine. Both defendant and her traveling companion, Annette Addison, were arrested.

Defendant's and Addison's trials were severed due to possibly antagonistic defenses, but they were held simultaneously. The State's witnesses included customs inspector Michael Boland, who was responsible for monitoring defendant's flight from Jamaica. He was suspicious of defendant's source of travel, clothing, behavior, and unemployed status, so he marked her declaration card with the letters "RN" for "rover narcotics." This marking puts the subsequent customs official on notice for his suspicion that she may be carrying illegal drugs.

Customs inspector Laura Zayner was the next customs official to interact with defendant. She testified that she observed defendant with a carry-on bag and a carton of alcohol. Defendant carried the carton, which contained three bottles, in plain view and with no attempt to conceal the package. Inspector Zayner took defendant to a secondary inspection point and noticed her declaration card was marked with "RN." Upon questioning, defendant told Inspector Zayner that she was traveling alone, she stayed at the "Dr. Cave" hotel in Jamaica, and she had paid a street vendor $300 for the champagne she was carrying. Defendant then agreed to a pat-down search, which did not reveal any contraband.

At this time, Inspector Zayner saw another customs inspector

talking with a woman, subsequently identified as Annette Addison, who was carrying a carton identical to defendant's. She, too, carried the carton in a conspicuous manner. Inspector Zayner also noticed that defendant's and Addison's airline tickets were consecutively numbered. Defendant told Inspector Zayner that she had seen Addison at her hotel but was not traveling with her. Field tests for narcotics were then conducted on the liquid in the bottles defendant and Addison carried which revealed the presence of cocaine. Inspector Zayner testified that in her 10 years as a customs inspector, she had never seen liquid cocaine in a bottle.

After defendant was arrested, United States Customs Senior Special Agent Josephine Tavolacci questioned defendant. Defendant told Special Agent Tavolacci that, while getting her hair done, her beautician, Amanda, said she was unable to take a planned trip to Jamaica. When Amanda asked defendant if she would go in her place, defendant agreed. Shortly thereafter, Addison arrived at defendant's house and told defendant her trip expenses would be paid if she brought back some bottles of alcohol. Addison told her it was "okay" to bring the alcohol to Chicago because there was none like it in the United States. Defendant also told Special Agent Tavolacci that they did not meet anyone else connected with the trip and that the bottles of liquor already were in the taxicab she and Addison took from the hotel to the airport in Jamaica.

Defendant was next questioned by Assistant State's Attorney (ASA) Michael McCormick. According to ASA McCormick, defendant explained that Addison showed up at defendant's house and told her that a mutual friend said defendant would be willing to go to Jamaica. In exchange for the trip, Addison said defendant would have to bring back some champagne. Addison further stated that it was not illegal and would not cost her any money. Defendant agreed to go and they stayed at a hotel called Glorianna's. As they were leaving the hotel at the end of the trip, six bottles containing what looked like wine were already in the taxicab that took them to the airport. Addison told her the bottles contained champagne and, if defendant was asked about them, she was to say she bought them for $300. Defendant was told not to sit next to Addison on the airplane and to get into a separate customs line. Defendant told ASA McCormick that she first learned she was carrying drugs when she was detained in the customs line. She explained she was nervous about lying because she did not know how she would explain that a welfare mother spent $300. Defendant also told ASA McCormick that she lied to Inspector Zayner because she did not want Addison to hear her say otherwise.

David Schlewitt, a forensic chemist, testified for the State that the

contents of each bottle weighed 693.5 grams for a total weight of 1,387 grams. Further tests of the liquid revealed it was comprised of 29% cocaine, although the record is unclear whether the percentage refers to volume or weight. According to defendant, excluding the weight of the liquid would yield a weight of 294.23 grams of contraband. The noncocaine portion of the solution was not identified, but Schlewitt testified that it could have been wine. Schlewitt further stated that he had analyzed substances for the presence of cocaine over 1,000 times, but had never previously seen liquid cocaine. There was no testimony from Schlewitt, or anyone else, however, as to whether the liquid was intended to be ingested along with the cocaine or whether the liquid was intended to be separated from the cocaine.

Defendant took the stand in her own defense. She testified that she first met Addison when Addison came to her house. Addison told her Amanda could not go on a trip to Jamaica and inquired as to whether defendant could go in her place. Because Addison said the trip was free, defendant asked if there was a catch. Addison responded that she had to bring some wine back and that it was legal. Defendant subsequently called Amanda, and Amanda informed her the trip was legal as well.

Defendant also stated that she and Addison flew to Jamaica with a third person, named Mack, whom she did not know. She shared a room with Mack at Glorianna's, their hotel. At the end of the trip, the three got into a taxicab to go to the airport. Already in the taxicab was a box of wine. She was told to pretend they did not know each other, to sit separately on the airplane, and to get into a different customs line. Defendant admitted lying to Inspector Zayner, but said she told ASA McCormick the truth, despite not telling him about Mack. She did not recall what she told Inspector Tavolacci. Defendant claimed she first learned cocaine was in the bottles when the field tests were performed.

The circuit court found defendant guilty of possession of more than 900 grams of a substance containing cocaine with intent to deliver. The court based its findings on the evidence presented, including the fact that defendant gave various versions of the events.

Defendant first contends the State failed to prove she knowingly possessed the narcotics diffused into the liquid in the bottles she was carrying. She claims the facts and circumstances as to how the trip came about belie any inference that defendant possessed the requisite knowledge.

■ A criminal conviction will not be set aside on review unless the evidence is so unsatisfactory or improbable that there remains a reasonable doubt of defendant's guilt. *People v. Byron*, 164 Ill. 2d 279,

299, 647 N.E.2d 946, 955 (1995). When the sufficiency of the evidence is challenged, it is not our role to retry the defendant. *People v. Boclair*, 129 Ill. 2d 458, 474, 544 N.E.2d 715, 722 (1989). Determinations regarding the witnesses' credibility, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are the responsibilities of the trier of fact. *People v. Steidl*, 142 Ill. 2d 204, 226, 568 N.E.2d 837, 845 (1991). In reviewing a sufficiency of the evidence claim, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that defendant knowingly possessed a controlled substance beyond a reasonable doubt. *People v. Smith*, 177 Ill. 2d 53, 73, 685 N.E.2d 880, 888 (1997). The element of knowledge, however, generally is difficult to establish by direct proof. *People v. Williams*, 267 Ill. App. 3d 870, 876, 642 N.E.2d 814, 819 (1994). Accordingly, knowledge may be established by evidence of acts, declarations, or conduct of the defendant from which it may be inferred that the accused knew of the existence of the narcotics. *People v. Nwosu*, 289 Ill. App. 3d 487, 494, 683 N.E.2d 148, 153 (1997).

■ A review of the record reveals that a rational trier of fact could have found beyond a reasonable doubt that defendant knew she was carrying contraband. The circumstances by which the trip to Jamaica arose were suspicious: defendant accepted a free trip from a woman whom she did not know and was told she only had to bring back wine to Chicago in return. Those suspicious circumstances alone may not have been sufficient to constitute knowledge, but they contributed to such an inference. The court relied upon the various statements defendant made to the law enforcement officials and at trial as evidence from which it could infer that defendant knew she was carrying drugs. Although defendant explained the reasons for some of her lies, it was for the trier of fact to observe her demeanor and determine the weight to be given her testimony and credibility. In our opinion, knowledge of the contents of the bottles reasonably could be inferred from defendant's numerous inconsistent and conflicting statements and the suspicious circumstances surrounding the trip.

Defendant further argues that a fairly drawn conclusion of her behavior is that defendant thought she might violate a customs law by transporting expensive wine into the country. Although this may be another explanation, this does not give the court's determination any less credence where, as here, it is fully supported by the evidence. Therefore, given the totality of the evidence adduced at trial and reviewing it in the light most favorable to the State, we conclude that a rational trier of fact could have found defendant guilty beyond a reasonable doubt.

■ Defendant next asserts she was denied due process because the circuit court relied on erroneously recollected evidence to find her guilty. The court enumerated some, but specifically stated it would not mention all, of the various versions of her trip that she told to the different officials. The court did mention, however, that defendant told the ASA the bottles were "at the door step upon leaving her hotel." In actuality, the ASA testified that defendant told him the bottles were in the taxicab.

We are not persuaded that the court's incorrect recollection of the bottles' location had any bearing on defendant's conviction. The court also based its decision on inferences drawn from defendant's numerous other conflicting statements. Because defendant would have been convicted despite the court's misstatements, any error is harmless. See *People v. Dean*, 175 Ill. 2d 244, 259, 677 N.E.2d 947, 954 (1997).

■ The third argument made by defendant is that she was denied her sixth amendment right to present a defense because the court precluded her from calling Addison as a witness. Addison was a codefendant until their trials were severed. Even though the trials were severed, they were held simultaneously. Defendant claims Addison's testimony would have corroborated her testimony and been helpful to her defense.

Addison testified in her own trial and acknowledged that she had gone to defendant's home to tell her about the trip, that defendant was going in Amanda's place, and that defendant did not have to pay for the trip. After Addison rested, defendant attempted to call Addison as a witness in her own trial for the purpose of eliciting the limited testimony that she went to defendant's house to offer the free trip in place of Amanda. Addison's attorney objected on the grounds that Addison "already testified to that." Defendant's request to call Addison was denied "because of the considerations of antagonistic defense and 5th Amendment rights."

The sixth amendment gives a defendant the right to offer testimony. *People v. McLaurin*, 184 Ill. 2d 58, 89, 703 N.E.2d 11, 25 (1998). However, more than the absence of such testimony is necessary to establish a violation of that right. The defendant must make a plausible showing of how the absent testimony would have been material and favorable to his defense. *McLaurin*, 184 Ill. 2d at 89, 703 N.E.2d at 26. "The pertinent inquiry with respect to materiality is not whether the evidence might have helped the defense but whether it is reasonably likely that the evidence would have affected the outcome of the case." *McLaurin*, 184 Ill. 2d at 89, 703 N.E.2d at 26.

Addison's testimony may have corroborated defendant's trial testimony that Addison went to defendant's house to tell her about

the trip without mentioning the trip's true purpose. However, she has made no showing as to how Addison's testimony would have been material to her defense such that the outcome of her case would have been affected. The court relied on defendant's inconsistent statements that she made to the various law enforcement officials and at trial. Further, even if Addison had testified in defendant's case, the court indicated that she, too, was not credible. Finally, the testimony as to how the trip arose, if believed, added to the suspicious nature of the trip's initiation. It is the suspicious circumstances, not defendant's and Addison's denials that drugs were mentioned, that contributed to the inference of knowledge. Consequently, defendant has failed to satisfy the materiality requirement.

■ Defendant also claims she was denied a fair trial because the prosecutor misstated evidence during his closing argument. The prosecutor stated that defendant said her coworkers paid for the trip, the vendor who sold her the bottles was unemployed, and the vendor sometimes worked as a maintenance person. Although the evidence does not support the prosecutor's statements, they do not amount to reversible error because the remarks had no bearing on defendant's conviction. See *People v. Pasch*, 152 Ill. 2d 133, 185, 604 N.E.2d 294, 315 (1992) (improper comments by the prosecutor in closing argument are not reversible error unless they resulted in substantial prejudice to defendant such that, absent the remarks, the verdict would have been different).

There is no evidence the court relied on the statements in finding defendant guilty and, in fact, the evidence shows the court did not rely on them. The court expressly stated that the evidence showed the trip was paid for by someone defendant did not know and that defendant told Inspector Zayner "she bought some champagne for $300 from a guy on the street." Because the court did not rely on the prosecutor's misstatements as a basis for its findings, defendant suffered no prejudice.

■ Defendant's final contention on appeal is that the court erred by including the weight of the liquid in which the cocaine was diluted to find she possessed over 900 grams of a controlled substance. Defendant argues that including the weight of the liquid to calculate the weight of the controlled substance contravenes the legislature's intent of punishing traffickers of drugs more severely than occasional petty distributors. Further, she claims the Illinois Constitution's proportionality requirement is violated by including the weight of the liquid. For example, possession of 294.23 grams of cocaine is no more serious, defendant contends, whether diluted in a liquid weighing 100 grams or weighing 1,000 grams, because the amount of cocaine reaching the "customer" is the same.

This issue is one of statutory construction. When determining the meaning of a statute, we must ascertain and give effect to the intent of the legislature. *Kunkel v. Walton*, 179 Ill. 2d 519, 533, 689 N.E.2d 1047, 1053 (1997). In this endeavor, the statutory language will be examined first as it is the best indication of the legislature's intent. *Kunkel*, 179 Ill. 2d at 533, 689 N.E.2d at 1053. Where the language is clear, it will be given effect without turning to other aids for construction. *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill. 2d 76, 81, 630 N.E.2d 820, 822 (1994). Unambiguous terms that are not specifically defined must be given their plain and ordinary meaning. *Hernon v. E.W. Corrigan Construction Co.*, 149 Ill. 2d 190, 194-95, 595 N.E.2d 561, 562 (1992).

Section 401(a)(2)(D) of the Controlled Substances Act provides that a person who knowingly possesses with intent to deliver "900 grams or more of any substance containing cocaine" shall be sentenced to 15 to 60 years' imprisonment. 720 ILCS 570/401(a)(2)(D) (West 1996). Here, the plain language of section 401(a)(2)(D) is clear. "[A]ny substance containing cocaine" is an unequivocal phrase contemplating the inclusion of more than pure cocaine in the weight calculation. The question then becomes, What did the legislature intend by the word "substance"? "Substance" is not defined within the statute. In the absence of a definition, this unambiguous term must be given its plain and ordinary meaning. A "substance" is defined as a "matter of definite or known chemical composition: an identifiable chemical element, compound, or mixture—sometimes restricted to compounds and elements." Webster's Third New International Dictionary 2279 (1981). A "mixture" is defined as "a portion of matter consisting of two or more components that do not bear a fixed proportion to one another and that however thoroughly commingled are regarded as retaining a separate existence." Webster's Third New International Dictionary 1449 (1981).

The cocaine-containing liquid in this case certainly falls within the ordinary meaning of the term "mixture," which is encompassed within the definition of "substance." The unambiguous language of this statute evinces the intent of the legislature that it did not intend to exclude the liquid within which the cocaine is diluted in calculating the weight of the contraband. Because legislative intent is clear from the plain language of the statute, it is unnecessary to resort to legislative history or other aids for construction. "There is no rule of construction which authorizes a court to declare that the legislature did not mean what the plain language of the statute imports." *Kunkel*, 179 Ill. 2d at 534, 689 N.E.2d at 1054.

Further, nowhere in the statute does the legislature impose condi-

tions upon or prescribe exceptions to the term "substance" specifically or generally. "[A] court is not at liberty to depart from the plain language of a statute by reading into it exceptions, limitations or conditions that the legislature did not express." *Kunkel*, 179 Ill. 2d at 534, 689 N.E.2d at 1054. If the legislature intended to exclude the liquid, it could have specifically articulated such an exception.

Defendant suggests that we follow the federal cases that have implemented a "market-oriented" approach, where consumption is the key factor, in determining the weight calculation. However, absent from the statute is any language that the legislature intended such an approach. It is not our function to read into the statute that which contradicts the plain meaning of the statute. Further, the statute does not contain instructions to the court explaining how or in which situations a market-oriented approach should be applied. The statute also is silent on the issue of what additional hearings or evidence may be required in order for the court to make a determination as to weight.

Nor does our construction violate the proportionality provision of the Illinois Constitution, which states, "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. This provision places some restraint on the right of the legislature to establish penalties for crimes. *People v. Farmer*, 165 Ill. 2d 194, 209-10, 650 N.E.2d 1006, 1014 (1995). However, the constitution's proportionality requirement warrants interference with legislative judgment only where the punishment is cruel, degrading, or " 'so wholly disproportionate to the offense committed as to shock the moral sense of the community.' " *Farmer*, 165 Ill. 2d at 210, 650 N.E.2d at 1014, quoting *People v. Gonzales*, 25 Ill. 2d 235, 240, 184 N.E.2d 833, 835 (1962). Courts are reluctant to invalidate penalties because the legislature is more capable of measuring the seriousness of offenses. *People v. Williams*, 250 Ill. App. 3d 80, 81, 621 N.E.2d 62, 63 (1993).

We cannot say that including the liquid in the weight calculation is cruel, degrading, or wholly disproportionate to the offense. The legislature reasonably may have decided to aggressively combat and punish more severely those offenders who use such blatant means to conceal and transport contraband. Diluting cocaine in a liquid allows more offenders to openly pass through customs unnoticed, enabling distribution to more people. This rationale comports with the plain language of the statute and furthers the objective of punishing offenders who distribute to more customers. Accordingly, we do not find that including the noncocaine liquid in the weight calculation results in penalties that are unconstitutionally disproportionate to the offense.

Defendant argues that a plain reading of the statute could lead to unfair results because two offenders carrying the same amount of cocaine could be sentenced to very different prison terms. For example, an individual carrying 30 grams of cocaine diffused in a bottle of wine could be sentenced to a prison term that is significantly shorter than a person carrying 30 grams of cocaine in a barrel of wine.

Extreme scenarios can be imagined, but inherent in the sentencing scheme is a provision that curtails absurd results. The statute creates gradations in the weight of the substance containing cocaine until the weight reaches 900 grams. At that point, the statutory maximums as to weight and sentencing range are achieved where the statute provides for 15 to 60 years for "900 grams or more." Whether an offender is convicted of possessing 901 grams or 10,000 grams, the sentencing range is the same. Therefore, the sentencing scheme protects against the outrageous consequences that defendant contends will result.

Reliance on *Chapman v. United States*, 500 U.S. 453, 114 L. Ed. 2d 524, 111 S. Ct. 1919 (1991), and other federal circuit court cases is misplaced. Those cases stem from and interpret the federal sentencing guidelines. Although the federal sentencing guideline at issue in those cases is similar to that of Illinois, the interpretation of that guideline was based upon congressional intent. The Supreme Court determined that Congress intended a market-oriented approach in enacting the statute because it concluded that Congress was concerned with usable drugs on the market. This reasoning does not apply to Illinois law because we have found the plain meaning of the statute to be unambiguous and, therefore, we may not delve into legislative intent. Further, simply because the Supreme Court concluded that Congress intended a market-oriented approach is not evidence that our legislature intended the same.

Finally, even if we were to adopt the *Chapman* analysis, there is no evidence in the record explaining how this form of cocaine would be transformed and in what form this cocaine would ultimately be consumed. In *Chapman*, the Court had an abundance of facts, data, and statistics on the distribution and consumption of LSD available, enabling the Court to make a reasoned analysis based upon the specific properties of that drug. Our record is devoid of any evidence pertaining to the marketability and ingestion of liquid cocaine. We were not provided with any expert, scientific, or even lay information as to how, if at all, the cocaine would be separated from the liquid. Without such concrete information, it is impossible to make a determination as to the amount of cocaine that would be used by the final consumer.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

HARTMAN, J., concurs.

PRESIDING JUSTICE HOURIHANE concurring in part and dissenting in part:

I concur with the majority that the evidence established defendant's guilt of possession of a controlled substance, with intent to deliver, beyond a reasonable doubt. However, I disagree with the majority that the plain and unambiguous language of section 401(a)(2)(D) of the Controlled Substances Act (Act) requires that the weight of the wine be included in determining the weight of "any substance containing cocaine" for purposes of the graduated sentencing scheme.

The manufacture and delivery of a controlled substance generally includes three identifiable elements: (1) the drug, itself, in its raw or pure form; (2) the cutting agents or filler substances mixed or merged with the drug to make it ready for distribution and consumption; and (3) the transport and packaging media.

I am unaware of any Illinois case in which the weight calculation of the substance containing the drug has included the weight of those materials and substances used in the transport and packaging of the drug. Further, I read our supreme court's decision in *People v. Mayberry*, 63 Ill. 2d 1, 345 N.E.2d 97 (1976), as implicitly recognizing a market-oriented approach. In upholding the constitutionality of the sentencing classifications under the Act, the *Mayberry* court determined that classifications based on the manner in which the drug is marketed are not irrational and are a reasonable basis for distinction in the sentencing provisions. I would thus apply the Act in the case at bar consistent with the *Mayberry* opinion and focus on the manner in which the cocaine here was intended for market.

Significantly, the State offered no evidence that the wine was anything other than a means of masking the cocaine during shipment, or that the wine was intended to be marketed and consumed with the cocaine as a mix. While the bottled wine is not the typical container for moving cocaine, I see no basis for distinguishing between it and the more usual transport media. See *United States v. Acosta*, 963 F.2d 551 (2d Cir. 1992) (excluding weight of cream liqueur, used to mask cocaine during shipment but not intended to be ingested with the drug); *United States v. Bristol*, 964 F.2d 1088 (11th Cir. 1992) (excluding weight of wine, where wine was transport medium only and wine/cocaine mixture was not ready for consumption by ultimate user).

The majority rejects the market-oriented approach based on the plain language of the statute. However, the majority's plain-language interpretation has the disturbing potential for greatly disparate sentences for possession of the same amount of a usable drug, depending on the manner in which it is packaged for shipment. In construing a statute, courts must consider not only the form of the statute, but the consequences of construing it one way or another. *Castaneda v. Illinois Human Rights Comm'n*, 132 Ill. 2d 304, 325, 547 N.E.2d 437, 447 (1989). In so doing, courts will assume that the legislature did not intend to produce an unjust result. *People v. Bole*, 155 Ill. 2d 188, 195, 613 N.E.2d 740, 743 (1993). I believe the majority's interpretation does not satisfy these fundamental requirements of statutory construction. See *United States v. Rolande-Gabriel*, 938 F.2d 1231 (11th Cir. 1991) (excluding weight of liquid carrier mediums with which cocaine is mixed to avoid unjust sentencing results). Accordingly, I dissent.