No. 2--02--0520                                  

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ) Appeal from the Circuit

ILLINOIS, ) Court of Lake County.

)

Plaintiff-Appellee, )

)

) No. 01--CF--1091

)

SEAN P. KUCHARSKI, ) Honorable

) Raymond J. McKoski,

Defendant-Appellant. ) Judge, Presiding.

JUSTICE GROMETER delivered the opinion of the court:

Defendant, Sean P. Kucharski, was convicted of controlled substance trafficking (720 ILCS 570/401.1 (West 2000)), following a bench trial in the circuit court of Lake County.  Defendant was also convicted of three related counts that the trial court found arose from the same act.  The trial court sentenced defendant to 16 years' imprisonment.  Defendant now appeals, alleging two errors.  First, he contends that testimony of medical personnel, as well as some evidence they recovered during the course of a surgery, should not have been presented at trial due to the physician-patient privilege (735 ILCS 5/8--802 (West 2000)).  Second, he argues that he was not proven guilty of possessing over 200 grams of a controlled substance, for the substance was weighed while wet, which improperly elevated its weight.  For the reasons that follow, we affirm as modified and remand for a new sentencing hearing.

I. BACKGROUND

To facilitate an understanding of this case, we will summarize the events leading up to defendant's conviction.  However, as the issues raised by defendant are discrete, we will discuss details of the evidence presented at trial in the course of addressing defendant's arguments.

On March 29, 2001, defendant entered Good Shepherd Hospital in Barrington and was attended to by Dr. Gia Compagnoni.  An X ray revealed that he had numerous balloons in his digestive tract, and it appeared that defendant was suffering from an amphetamine overdose.  Compagnoni eventually performed surgery to remove the balloons.

Officer Tim Gretz, of the Lake County Metropolitan Enforcement Group, was present at Good Shepherd.  He observed the surgery and had several communications throughout the day with medical personnel regarding defendant's condition.  Following the surgery, he, along with medical personnel from Good Shepherd, collected and counted the balloons.  Approximately 230 balloons were recovered.  Subsequently, a number of the balloons were tested and determined to contain methylenadioxy-methamphetamine or MDMA, which is commonly known as ecstacy.

Gretz testified that he had been directed to Good Shepherd by his supervisor.  After arriving, he spoke with Leroy Monroy, an officer from the North Central Narcotics Task Force.  Monroy told him that there was a patient at the Northern Illinois Medical Center by the name of Charlotte Cox, who had apparently ingested a number of balloons filled with ecstacy.  Monroy informed Gretz that, in the course of their investigation, they had learned that Cox knew defendant.  Cox and defendant had recently returned from a trip to Amsterdam and both had gotten sick.  At trial, Cox testified to details of the trip, including that the two had ingested a large number of balloons filled with ecstacy.  Four medical personnel from Good Shepherd also testified at trial: Compagnoni; Jonathan Aristoza, a nurse who assisted in the operation; Carol Alfieri, an administrative nursing supervisor; and Margaret Ann Obenauf, a nurse who was working in the emergency room when defendant arrived. 

Gretz also testified that he was in a scrub room adjacent to the operating room during the operation.  There was a window between the two rooms.  Gretz stated that he observed the entire surgery and saw Compagnoni remove numerous balloons from defendant's abdomen.  Following the surgery, he, with the assistance of hospital personnel, counted the balloons.  Gretz then took possession of them.

Prior to trial, defendant moved to exclude the testimony of the four medical personnel, as well as the physical evidence recovered during the operation.
  The trial court rejected defendant's request.  Relying on 
People v. Torres
, 144 Ill. App. 3d 187, 190-91 (1986), the trial court first concluded that defendant had no reasonable expectation of privacy in the operating room.  The trial court also relied on section 3.2 of the Criminal Identification Act (20 ILCS 2630/3.2 (West 2000)) in holding that the hospital had a duty to inform the police of defendant's condition.  The trial court also held that the ecstacy was properly weighed while it was wet because that was the state in which it was taken from defendant.  Defendant now appeals.

II. ANALYSIS

We will first address defendant's contention that evidence should have been excluded under the physician-patient privilege (735 ILCS 5/8--802 (West 2000)).  We will then turn to the question of whether it was proper to weigh the ecstacy taken from defendant while it was wet.

A. The Physician-Patient Privilege

Defendant raises two distinct arguments regarding the application of the physician-patient privilege.  First, he argues that the personnel who were involved in his treatment at Good Shepherd should not have been allowed to testify at trial.  Second, he contends that the physical evidence gathered during the course of his treatment should have been suppressed.  We agree with his first point, but not his second.  Furthermore, we hold that the error in allowing the medical personnel to testify was harmless.  

Generally, a trial court's ruling on a motion to suppress evidence is entitled to significant deference and will be disturbed only if it is manifestly erroneous.  
People v. Murray
, 137 Ill. 2d 382, 387 (1990).  However, the relationship between the physician-patient privilege (735 ILCS 5/8--802 (West 2000)) and section 3.2 of the Criminal Identification Act (20 ILCS 2630/3.2 (West 2000)) presents a question of law, which is subject to 
de novo
 review.  
People v. Childress
, 338 Ill. App. 3d 540, 547 (2003).

The physician-patient privilege is codified at section 8--802 of the Code of Civil Procedure.  735 ILCS 5/8--802 (West 2000).  This section provides, in pertinent part, as follows: "No physician [or] surgeon *** shall be permitted to disclose any information he or she may have acquired in attending any patient in a professional character, necessary to enable him or her professionally to serve the patient ***."  735 ILCS 5/8--802 (West 2000).  The section goes on to enumerate several exceptions to the privilege, none of which is relevant to the instant case.  The privilege covers not only physicians, but also support personnel involved in rendering treatment to a patient.  
Lewis v. Illinois Central R.R. Co.
, 234 Ill. App. 3d 669, 679 (1992).  It exists to encourage full disclosure by a patient to ensure that he or she receives the best possible diagnosis and treatment.  
People v. Wilber
, 279 Ill. App. 3d 462, 467 (1996).

Section 3.2 of the Criminal Identification Act (20 ILCS 2630/3.2 (West 2000)) also creates an exception to the physician-patient privilege.  Specifically, it states:

"It is the duty of any person conducting or operating a medical facility, or any physician or nurse as soon as treatment permits to notify the local law enforcement agency of that jurisdiction upon the application for treatment of a person who is not accompanied by a law enforcement officer, when it reasonably appears that the person requesting treatment has received:

***

(2) any injury sustained in the commission of or as a victim of a criminal

offense."  20 ILCS 2630/3.2 (West 2000).

Thus, "Illinois law requires medical personnel to inform authorities of any person requesting treatment when their injuries may have been caused by criminal conduct."  
Torres
, 144 Ill. App. 3d at 191.  It has been noted that an "obvious consequence of requiring such reports is that police officers will begin their investigations at the medical facility."  
Torres
, 144 Ill. App. 3d at 191.  Additionally, a well-established principle of statutory construction is that when two statutes are applicable, the more specific statute controls over the more general one.  
Bradshaw v. City of Metropolis
, 293 Ill. App. 3d 389, 393 (1997).  Here, the Criminal Identification Act is more specific, for it addresses what physicians must do when they come upon an individual with injuries possibly incurred during a criminal act, as opposed to the more general provisions of the physician-patient privilege statute.  Hence, it controls.

Turning first to the physical evidence recovered during the surgery, we hold that it was properly admitted at trial.  There was nothing inappropriate about the medical personnel and Good Shepherd communicating to Gretz that they were treating defendant.  In fact, this action was required by section 3.2 of the Criminal Identification Act (20 ILCS 2630/3.2 (West 2000)).   Furthermore, as the trial court observed, that the personnel communicated certain details about defendant's condition to the police was required.  In enacting section 3.2, we do not believe that the legislature intended that the police be notified simply of the existence of a patient.  It surely intended that some basic information, such as the patient's identity and the nature of the injury, be communicated so that the information would be useful to the police.  Reading section 3.2 as requiring only that medical personnel tell the police that they have some unidentified patient who is suffering from some unspecified injury would be absurd, and, in interpreting a statute, we presume that the legislature did not intend an absurd result.  
People v. Shanklin
, 329 Ill. App. 3d 1144, 1146 (2002).

Moreover, the record discloses that Gretz learned of defendant's existence from a source other than the medical personnel at Good Shepherd.  During the suppression hearing, Gretz testified that he was informed by Monroy, the agent form the North Central Narcotics Task Force, that the agency he worked for had an agent with Cox at another hospital.  Cox had admitted to swallowing a balloon filled with five ecstacy pills and also related that she had been to Amsterdam with defendant.  Monroy also told Gretz that he was aware that defendant had been taken to Good Shepherd for a possible drug overdose.  Thus, it is probable that Gretz would have been at Good Shepherd regardless of whether he received any information from hospital personnel.

Thus, we conclude that any of the information conveyed to Gretz that caused him to be present during defendant's surgery was properly conveyed to him.  Section 3.2 of the Criminal Identification Act (20 ILCS 2630/3.2 (West 2000)) mandated that the hospital inform the police of defendant's existence and condition, and much additional information regarding defendant came from a source other than the hospital.  The inquiry now turns to whether any of Gretz's conduct at the hospital violated any right held by defendant.

Nothing Gretz did impinged upon any of defendant's rights.  Defendant held no reasonable expectation of privacy in the operating room.  See 
Torres
, 144 Ill. App. 3d at 191; 
Buchanan v. State
, 432 So. 2d 147, 148 (Fla. App. 1983); 
State v. Thompson
, 222. Wis. 2d 179, 187, 585 N.W.2d 905, 909 (1998)
.  Thus, there is no legal basis for defendant to object to Gretz's presence in the scrub room adjacent to the operating room, nor to the fact that Gretz observed the surgery.  From this position, Gretz was able to observe Compagnoni remove numerous balloons from defendant's abdomen.  These events occurred within Gretz's line of sight.  The plain view doctrine permits an officer to seize an item if "(1) he views the object from a place he is legally entitled to be, and (2) the object is immediately apparent to him to be evidence of a crime, contraband or otherwise subject to seizure."  
People v. DeLuna
, 334 Ill. App. 3d 1, 13 (2002).  As discussed above, Gretz was in a place he was entitled to be.  Further, having seen a number of balloons removed from defendant's body, it should have been immediately apparent to him that the balloons were evidence of a crime.   Defendant relies on 
People v. Maltbia
, 273 Ill. App. 3d 622 (1995), in support of his argument.  In that case, medical personnel discovered what appeared to be marijuana concealed in the defendant's underwear during the course of their treatment of him.  The reviewing court, relying on the physician-patient privilege, held that the trial court properly granted the defendant's motion 
in limine
 to suppress the evidence.  
Maltbia
, 273 Ill. App. 3d at 628-29.  
Maltbia
, however, is distinguishable.  In that case, no police officers were present at the time the marijuana was discovered.  Indeed, Justice Holdridge, specially concurring in 
Maltbia
, observed that, "had a police officer been present in the emergency room, personally observed the bag being removed from the defendant, and personally observed the contents of the bag, that officer could testify to his own observations."  
Maltbia
, 273 Ill. App. 3d at 631 (Holdridge, J., specially concurring).  The instant case is more like the scenario envisioned by Justice Holdridge.

Thus, we conclude that the seizure of the ecstacy was permissible.  Since the events were permissibly observed by Gretz, they were in no sense confidential or privileged.  Therefore, we hold that the admission of this evidence was not barred by the physician-patient privilege (735 ILCS 5/8--802 (West 2000)).

Regarding the testimony of the medical professionals presented at trial, we come to a different conclusion.  As noted above, the physician-patient privilege (735 ILCS 5/8--802 (West 2000)) creates a general rule of nondisclosure regarding information a physician garners in the course of treating a patient.  Several exceptions exist, including the provision of the Criminal Identification Act (20 ILCS 2630/3.2 (West 2000)) set forth above.  The exceptions enumerated in the statute setting forth the privilege itself read as follows:

"(1) 
in trials for homicide
 when the disclosure relates directly to the fact or immediate circumstances of the homicide, (2) 
in actions, civil or criminal
, against the healthcare practitioner for malpractice ***, (3) with the expressed consent of the patient, or in case of his or her death or disability, of his or her personal representative or other person authorized 
to sue
 for personal injury or of the beneficiary of an insurance policy on his or her life, health, or physical condition, (4) 
in all actions brought by the patient
, his or her personal representative, a beneficiary under a policy of insurance, or the executor or administrator of his or her estate wherein the patient's physical or mental condition is an issue ***, (5) upon an issue as to the validity of a document as a will of the patient, (6) 
in any criminal action
 where the charge is either first degree murder by abortion, attempted abortion or abortion, (7) 
in actions, civil or criminal
, arising from the filing of a report in compliance with the Abused and Neglected Child Reporting Act, (8) to any department, agency, institution or facility which has custody of the patient pursuant to State statute or any court order of commitment, (9) 
in prosecutions
 where written results of blood alcohol tests are admissible pursuant to Section 11-501.4 of the Illinois Vehicle Code, or (10) 
in prosecutions
 where written results of blood alcohol tests are admissible under Section 5--11a of the Boat Registration and Safety Act."  (Emphasis added.)  735 ILCS 5/8--802 (West 2000).

In each case where the privilege may be breached so that medical personnel may testify in a trial, the legislature explicitly used terms such as "in prosecutions" or "in criminal actions."  However, section 3.2 of the Criminal Identification Act (20 ILCS 2630/3.2 (West 2000)) merely states that medical personnel must notify the police in certain situations; it contains no language indicating that such information may be the subject of courtroom testimony.  The ease with which the legislature set forth the exceptions in section 8--802 leads us to conclude that, if it had intended section 3.2 to work a similar effect, it would have said so.  See  
North Shore MRI Centre v. Department of Revenue
, 309 Ill. App. 3d 895, 900 (1999) ("Had the legislature intended the reference to urine testing materials for diabetics to be merely an example of the type of testing materials exempt under the Act, it could have easily included language so indicating"); 
First Arlington National Bank v. Stathis
, 115 Ill. App. 3d 403, 409 (1983) (noting "had the legislature wished to include others, it could have done so easily").  

Thus, we hold that the exception to the physician-patient privilege set forth in section 3.2 is a limited one, allowing medical personnel to notify the police that a patient is suffering from injuries that appear to have been caused by a crime.  Beyond this, the statute is silent, and we will not extend it any further than its plain language.  Accordingly, we conclude that it was error to allow the medical personnel to testify regarding information they obtained in treating defendant that fell within the scope of the physician-patient privilege.

While we conclude that allowing such testimony was error, we also conclude that it was harmless.  An error may be deemed harmless if "the evidence supporting a defendant's conviction is so overwhelming that the defendant would have been convicted even if the error was eliminated."  
People v. Tucker
, 317 Ill. App. 3d 233, 243 (2000).  In the instant case, the physical evidence recovered from defendant was properly admitted.  Thus, the drugs he was charged with possessing were before the court.  More importantly, Gretz personally observed the ecstacy-filled balloons being removed from defendant's abdomen.  Additionally, Cox testified to the events that occurred in Amsterdam, particularly that defendant purchased ecstacy, placed it in balloons, and swallowed it.  Cox's testimony might not be so compelling standing alone, due to her hope to secure lenity in her own case.  However, the drugs she described defendant swallowing were actually recovered from defendant's abdomen.  Thus, defendant's assertion that absent the testimony of the medical personnel, the State could not have established that he possessed the contraband is ill founded.

Moreover, much of their testimony was cumulative of properly admitted evidence.  Aristoza and Compagnoni described the operation, but so did Gretz.  Compagnoni described the X ray showing the balloons inside of defendant; however, Gretz testified that he observed the balloons being removed from defendant.  Obenauf's testimony regarding defendant's statement that he swallowed balloons filled with ecstacy while in Europe was cumulative of Cox's testimony as well as the fact that around 230 balloons filled with ecstacy were removed from defendant's abdomen.  In short, no reasonable trier of fact would have acquitted defendant even if the medical personnel who treated him had not testified.

To conclude, the trial court committed no error in denying defendant's motion to suppress the evidence recovered during the surgery.  Furthermore, the erroneous admission of the testimony of the medical personnel who treated defendant was harmless.  We therefore reject defendant's argument on this point.

B. Whether the State Proved that Defendant Possessed More than 200 Grams of Ecstacy

Defendant next argues that he was not proven to have possessed the quantity of a controlled substance required to be found guilty of committing a Class X offense.  He bases this argument on the fact that the drugs were weighed while they were wet.  Apparently some of the ecstacy in some of the balloons had been adulterated with defendant's bodily fluids.  Initially, we note that the State contests the factual premise of defendant's argument.  The trial court, however, found that the ecstacy "was wet when it was taken from the defendant because it was in his body."  A trial court's factual findings are entitled to great deference and will be reversed only if contrary to the manifest weight of the evidence.  
People v. Quezada
, 335 Ill. App. 3d 233, 243 (2002).  We have reviewed the record and conclude that there is ample support for the trial court's finding.  Moreover, our review of the record indicates that, if the weight of the liquid with which the ecstacy was adulterated is excluded, the State did not prove that defendant possessed over 200 grams of ecstacy.  Hence, we are left with the legal question of whether it was proper to weigh this evidence while it was wet.  As this is a question of law, review is 
de novo
.  
Childress
, 338 Ill. App. 3d at 547.

Section 401.1(b) of the Illinois Controlled Substances Act (Controlled Substances Act) (720 ILCS 570/401.1(b) (West 2000)) states that the penalty for controlled substance trafficking shall be no less than twice the minimum nor more than twice the maximum term of imprisonment authorized by section 401 of the Controlled Substances Act.  Section 401(a)(11) makes it a Class X felony to possess with intent to deliver 200 grams or more of any substance containing a Schedule I or II controlled substance.  720 ILCS 570/401(a)(11) (West 2000).  Ecstacy, or MDMA, is classified as a Schedule I substance in section 204(d)(2).  720 ILCS 570/204(d)(2) (West 2000).  Thus, if defendant was proven guilty of possessing over 200 grams of a substance containing ecstacy, a sentence of between 12 and 60 years' imprisonment was authorized.  730 ILCS 5/5--8--1(a)(3) (West 2000).  Defendant contends, however, that the State proved only that he possessed between 50 and 200 grams of MDMA, which is a Class 1 felony that carries a sentence of between 8 and 30 years.  See 720 ILCS 570/401(c)(11) (West 2000); 730 ILCS 5/5--8--1(a)(4) (West 2000).

The State, of course, bears the burden of proving each and every element of a crime.  
People v. Sanders
, 212 Ill. App. 3d 773, 777 (1991).  The quantity of a controlled substance that a defendant is charged with possessing is an essential element of the offense of possession with intent to deliver (720 ILCS 570/401(a)(11) (West 2000)), and, consequently, controlled substance trafficking (720 ILCS 570/401.1(b) (West 2000)).  
People v. Williams
, 267 Ill. App. 3d 870, 879 (1994).  Possession of a smaller amount is a lesser included offense.  
People v. Jones
, 174 Ill. 2d 427, 428 (1996).

Regarding the question of whether the weight of the substance, while wet, was properly used to determine that defendant committed a Class X felony, we find significant guidance in 
People v. Mayberry
, 63 Ill. 2d 1 (1976).  In that case, the supreme court considered an equal protection challenge to the Controlled Substances Act in so far as it classifies the severity of an offense based on the weight of the substance involved, that weight being determined not by the amount of the pure controlled substance but by the entire weight of the substance containing the controlled substance.  
Mayberry
, 63 Ill. 2d at 8-9.  The supreme court rejected the challenge, finding a rational basis for the classification.  The court first noted that controlled substances are usually marketed in a diluted or impure state.  
Mayberry
, 63 Ill. 2d at 9.  It thus concluded that it was not irrational for the legislature to deal with the mixture rather than the drug itself.  
Mayberry
, 63 Ill. 2d at 9.  The court also found the scheme rational in that the legislature may have felt that a drug can be distributed to a greater number of people in a mixed state and can therefore be more dangerous.  
Mayberry
, 63 Ill. 2d at 9.  Hence, the supreme court's holding in 
Mayberry
 was based on the substance at issue being arguably more harmful once it is mixed for distribution.

Another case from which we take guidance is 
People v. Butler
, 304 Ill. App. 3d 750 (1999), on which the State relies heavily.  In 
Butler
, the defendant was convicted of possession of more than 900 grams of a substance containing cocaine with the intent to deliver.  
Butler
, 304 Ill. App. 3d at 754.  The cocaine had been diffused into liquid, which could have been wine, and placed in champagne bottles.  The total weight of the liquid exceeded 900 grams; however, a forensic chemist testified that cocaine compromised only 29% of the liquid.  There was no testimony as to whether the cocaine was to be ingested with the liquid or whether it was to be separated at some later time.  On appeal, the defendant argued that the trial court erred in including the weight of the liquid in finding that she possessed over 900 grams of a substance containing cocaine.  The First District rejected this argument, treating the issue as one of statutory construction.  
Butler
, 304 Ill. App. 3d at 758-59.  It first noted that section 401(a)(2)(D) of the Controlled Substances Act, which contains a provision identical to the one at issue in this case, states that a person violates that section if he or she possesses 900 grams or more of a " 'substance containing cocaine.' "  
Butler
, 304 Ill. App. 3d at 758, quoting 720 ILCS 570/401(a)(2)(D) (West 1996).  Relying on this plain language, the First District reasoned that the liquid in which the cocaine was diluted was a substance containing cocaine and was therefore properly included in determining the weight of the substance that the defendant was charged with possessing.  The court also rejected the defendant's argument that it should apply the "market-oriented" approach used by the federal courts, in which consumption is the dispositive factor in determining weight.  
Butler
, 304 Ill. App. 3d at 759.

In a well-reasoned dissent, Presiding Justice Hourihane
 warned that the majority's approach had "the disturbing potential for greatly disparate sentences for possession of the same amount of a usable drug, depending on the manner in which it is packaged for shipment."  
Butler
, 304 Ill. App. 3d at 762 (Hourihane, P.J., concurring in part and dissenting in part).  The dissent noted that, in interpreting a statute, a court will presume that the legislature did not intend to produce unjust results.  
Butler
, 304 Ill. App. 3d at 762 (Hourihane, P.J., concurring in part and dissenting in part).  Further, the dissent read 
Mayberry
 as implicitly recognizing the market-oriented approach.  
Butler
, 304 Ill. App. 3d at 761 (Hourihane, P.J., concurring in part and dissenting in part).  Like the dissent, defendant here argues that the supreme court adopted the market-oriented approach in 
Mayberry
.  While we share the concerns articulated by the dissent, we will not go so far as to conclude that the supreme court adopted the market-oriented approach, for, as the 
Butler
 majority held, such an approach would conflict with the plain language of the statute.

Mayberry
, nevertheless, is dispositive of this appeal, and 
Butler
 is distinguishable.  In 
Mayberry
, the statute survived an equal protection challenge because the intentional mixing of drugs with other substances creates a conceivable danger that the legislature could have rationally sought to address in promulgating the statute.  A drug, when mixed with another substance, could reach more people.  In the instant case, however, we are not confronted with an intentional mixing of the drug for some purpose associated with its use or marketing.  Rather, we are dealing with an unintentional adulteration of the substance.  We see no way that, once the ecstacy was soaked with defendant's bodily fluids, it became more marketable or could reach a greater number of people.  In fact, the converse is likely true.  Thus, the unintentional adulteration of the ecstacy caused no enhanced danger that is apparent to us.  Without some enhanced danger, the rationale of 
Mayberry
 falls away.  No rational basis exists for the legislative scheme.

Thus, although we do not read 
Mayberry
 as adopting the market-oriented approach 
per se
, its rationale requires the mixing of the drugs with another substance to cause the drug to be more harmful in some way.  One way, as the 
Mayberry
 court observed, would be to allow for distribution to a greater number of people.  
Mayberry
, 63 Ill. 2d at 9.  However, we cannot say that this is the only way in which mixing could enhance a drug's dangerousness.  For example, the scenario that the court confronted in 
Butler
 suggests that mixing the drug with another substance may make it more difficult to recognize the drug, thereby hampering law enforcement and permitting easier importation.

In 
Butler
, of course, there was no evidence indicating whether the cocaine had been mixed with the liquid for distribution, consumption, or merely to conceal it for importation.  If the drugs in 
Butler
 were mixed with the liquid solely for importation, there is a superficial similarity between 
Butler
 and the instant case.  The drugs at issue in this case became adulterated with a liquid as a consequence of how they were concealed for importation.  However, in 
Butler
, it is inferrable that the cocaine was deliberately mixed with the liquid, while in the instant case, the mixing was accidental.  That the mixing was purposeful in 
Butler
 makes it further inferrable that the mixing served some function regarding the use, marketing, or at least importation of the drug.  Because it made at least one of these things easier or more efficient, the mixing made the drug more dangerous in some sense.  Accordingly, in the scenario presented in 
Butler
, the rationale underlying the 
Mayberry
 decision continued to apply.  Conversely, in the present case, the mixing was accidental and the same series of inferences does not follow.  Because the mixing made the drug no more dangerous, 
Mayberry
's rationale is not applicable.

We therefore hold that, where a controlled substance is unintentionally adulterated, the weight of the adulterating agent must be discounted.  Defendant's conviction must be modified to the lesser included offense of controlled substance trafficking based on possession of between 50 and 200 grams of MDMA, a Class 1 felony.  See 720 ILCS 570/401(c)(11) (West 2000); 730 ILCS 5/5--8--1(a)(4) (West 2000). 

III. CONCLUSION

In light of the foregoing, the judgment of the circuit court of Lake County is affirmed as modified.  We remand this cause for resentencing.

Affirmed as modified; cause remanded.

BYRNE and KAPALA, JJ., concur.