971 So.2d 1116 (2007)
Wendell J. CALLAHAN, Jr. and Jerome M. Cousan
v.
CIRCUIT CITY STORES, INC., Employees A, B, and C of Circuit City Stores, Inc., and XYZ Insurance Company.
No. 2006 CA 1663.
Court of Appeal of Louisiana, First Circuit.
October 10, 2007.
Rehearing Denied November 15, 2007.
*1117 Emery Norton Voorhies, Maurice LeGardeur, Covington, LA, for Plaintiffs/Appellees, Wendell J. Callahan, Jr. and Jerome M. Cousan.
Robert W. Barton, Matthew L. Mullins, Baton Rouge, LA, for Defendant/Appellant Circuit City Stores, Inc.
Before PARRO, GUIDRY, GAIDRY, McCLENDON, and HUGHES, JJ.
McCLENDON, J.
Defendant, Circuit City Stores, Inc. (Circuit City), appeals the trial court's judgment in favor of plaintiffs, Wendell J. Callahan, Jr. (Callahan) and Jerome M. Cousan (Cousan). For the reasons that follow, we reverse and render.

FACTS AND PROCEDURAL HISTORY
On October 26, 2003, Michael Morris, manager of the Circuit City Store in Covington, Louisiana, observed two African-American men leaving the store under suspicious circumstances. Morris followed them out of the store and around the side of the building. Another Circuit City employee who was in his vehicle in the parking lot, Jonathan Hines, saw Morris pursuing the two men and drove up to Morris. After speaking with Morris, Hines began to follow the two men in Hines' vehicle, and contacted the St. Tammany Parish Sheriff's Office on his cell phone to report that he was following two shoplifting suspects. Hines saw the two men dump approximately twenty PlayStation 2 games outside of a Kentucky Fried Chicken restaurant and stopped to retrieve the games, during which time he lost sight of the two men. However, Hines saw the two men flee in the general direction of the nearby Wal-Mart and Hibernia Bank. After retrieving the games, Hines continued north along a service road on the west side of the Wal-Mart parking lot. While stopped at a stop sign, he noticed two individuals driving *1118 down a road on the north side of the Wal-Mart parking lot. It appeared to Hines that the driver was leaning back and covering his face, and the passenger was changing his shirt. Because Hines did not actually see the men he had been pursuing get into a car, he quickly scanned the general area. After failing to see anyone on foot, Hines followed the vehicle, advised the dispatcher with the St. Tammany Parish Sheriff's Office, with whom he had been in constant contact since he began following the two men, and reported the license number of the car. Ultimately, the car being driven by Callahan, in which Cousan was a passenger, was pulled over by St. Tammany Parish Sheriff's Officers on Highway 190 in Covington. Hines, who was still following the vehicle, stopped at the scene. Because he admittedly could not positively identify the suspects, he called Morris. Morris came to the scene and identified Callahan and Cousan as the men who had stolen the games from the Circuit City Store. At the time Callahan and Cousan were pulled over by the sheriff's office, approximately fifteen minutes after the shoplifters fled Circuit City, Callahan was wearing a white North Carolina t-shirt, baseball cap, and blue jean shorts, and Cousan was wearing a Wendy's uniform, consisting of black pants and a dark green shirt, and had an afro hairstyle. Callahan and Cousan were placed under arrest and subsequently charged with theft by shoplifting. On March 3, 2004, however, the charges were nolle prossed and dismissed.
On April 27, 2004, Callahan and Cousan filed suit against Circuit City, the employees who allegedly misidentified the plaintiffs as perpetrators of a crime,[1] and Circuit City's insurer. Plaintiffs sought damages for defamation, false arrest, false imprisonment, and malicious prosecution.[2] Circuit City answered the petition asserting several affirmative defenses, including qualified immunity for those who report possible criminal activity.
Following the trial, the trial court determined that the employees of Circuit City did not act with malice, but rather, were merely negligent in their identification of Callahan and Cousan as the perpetrators of the shoplifting. Despite that finding, the trial court apparently believed that the privilege had been abused, and found in favor of the plaintiffs, Callahan and Cousan. Judgment was rendered awarding Callahan $7,500.00 in general damages and $1,583.60 in special damages and awarding Cousan $12,000.00 in general damages and $1,178.75 in special damages.
Circuit City now appeals. In its brief, Circuit City asserted that the trial court erred in: (1) granting judgment in favor of Callahan and Cousan despite the factual finding that Circuit City acted without malice, which finding entitles Circuit City to qualified immunity and judgment in its favor as a matter of law; (2) awarding unreasonable and excessive general damages to Callahan and Cousan; and (3) awarding attorney's fees to Callahan and Cousan when such fees are not authorized by statute or contract.

APPLICABLE LEGAL PRECEPTS
Liability and Qualified Immunity
As stated above, all of Callahan and Cousan's claims for damages are based on *1119 the misidentification of them as perpetrators of a shoplifting at the Circuit City store in Covington. The Louisiana Supreme Court in Kennedy v. Sheriff of East Baton Rouge, 05-1418, p. 19 (La.7/10/06), 935 So.2d 669, 683, reiterated the longstanding practice of the courts of this state of recognizing that the public has an interest in bringing possible criminal activity to the attention of the proper authorities, and, on that basis, extending a qualified privilege to such reports made in good faith. Specifically, Kennedy, XXXX-XXXX at p. 19, 935 So.2d at 683, provided the following policy reasons as support for the extension of such a privilege:
It would be self-defeating for society to impose civil liability on a citizen for inaccurately reporting criminal conduct with no intent to mislead. If the risks to the citizen are too high, a fertile field for criminal suppression will have disappeared.
In other words, the qualified or conditional privilege extended to communication of alleged wrongful acts to the officials authorized to protect the public from such acts is founded on a strong public policy consideration: vital to our system of justice is that there be the ability to communicate to police officers the alleged wrongful acts of others without fear of civil action for honest mistakes.
The Kennedy court then outlined the two-step process for determining whether a conditional privilege exists. In the first step, it must be determined whether the attending circumstances of a communication occasion a qualified privilege. If so, the plaintiff must show in the second step that the privilege has been abused. A determination of whether the privilege has been abused requires an examination of the grounds for abuse, that is, malice or lack of good faith. Kennedy, 05-1418 at p. 18, 935 So.2d at 682. The court also noted that the first step is generally determined by the court as a matter of law, but the second step of determining abuse of a conditional privilege is generally a fact question for the jury, unless only one conclusion can be drawn from the evidence. Kennedy, 05-1418 at p. 18, 935 So.2d at 682.
The practical effect of the defendant's assertion of the conditional or qualified privilege is to rebut the plaintiffs allegations of malice, or reckless disregard, and to place the burden of proof on the plaintiff to establish abuse of the asserted privilege. Kennedy, 05-1418 at p. 20, 935 So.2d at 683. To establish an abuse of the privilege, a plaintiff must demonstrate that the person communicating alleged wrongful acts to an official, one authorized to protect the public from such acts, either knows the matter to be false, which constitutes malice, or acts with a reckless disregard for the truth. Kennedy, 05-1418 at pp. 22-23, 935 So.2d at 684-685.
To prove reckless disregard, the plaintiff must show that the communication was made despite the reporter's belief that it was probably false. Proof of gross negligence in the communication of a false statement is insufficient to prove reckless disregard. Kennedy, 05-1418 at pp. 28-29, 935 So.2d at 688. The court in Kennedy explained that conduct constituting reckless disregard is typically found where a story is fabricated by the defendant, is the product of his imagination, or is so inherently improbable that only a reckless man would have communicated it. Kennedy, 05-1418 at p. 30, 935 So.2d at 689. Mere negligence as to falsity is not sufficient to prove abuse of the privilege, and the failure to investigate a matter fully before contacting police also does not present a jury question on whether a statement was communicated with reckless disregard *1120 for the truth. Kennedy, 05-1418 at p. 31, 935 So.2d at 689.
In support of this heightened standard, the court stated:
[A]doption of the knowing falsity or reckless disregard for the truth standard of abuse in this case, which involves a report to law enforcement officers of suspected criminal activity, strikes a necessary and appropriate balance between a person's interest in protecting his or her reputation and the need to encourage individuals to report suspected criminal activity to the proper authorities without fear of being exposed to civil liability for honest mistakes. Unless such protection is extended, fear of being exposed to civil liability could discourage individuals from alerting police to suspicious activity, thereby enabling criminals to escape detection and endangering other potential victims. Individuals who engage in behavior beneficial to society should not be penalized by facing exposure to civil liability for mistakes in judgment attributable to simple negligence.
Kennedy, 05-1418 at p. 24, 935 So.2d at 685-86.

ANALYSIS
The authorities were in contact with Hines during the chase, and were aware that Hines had stopped to collect the merchandise. The deputy wrote in his report that Hines, after collecting the merchandise, "proceeded to where he had last seen the subjects. . . ." Thus, the authorities knew or should have known that Hines briefly lost sight of the suspects. Hines never claimed that he saw the faces of the suspects or that he continually had the suspects in his sight. Because he could not identify the men after the car was stopped by the deputies, he called Morris.
At the trial on March 16, 2006, Morris stated that he got a good look at the face of one male, but could not see the face of the other. Morris testified that the man whose face he saw was wearing a white t-shirt and long blue jeans. Although the other man was also wearing long blue jeans, he had on a dark colored t-shirt. Morris also testified that both men had short hairstyles. Admittedly, Morris primarily based his identification of Cousan on the fact that he was with Callahan, the man whose face Morris believed he had seen.
In his report to the deputy on the scene of the arrest, Morris included a brief description of the clothing worn by the two males Morris observed in the store. He did not attempt to hide any discrepancies in the descriptions. Thus, the deputy had sufficient information to realize that the description of the clothing worn by the suspects in the store differed from that worn by the plaintiffs when they were stopped and arrested by the deputies.
After a thorough review of the record, especially in light of the statements made by Morris and Hines to deputies, we see no error in the trial court's finding that defendants' actions constituted mere negligence, without malice. Specifically on the absence of malice question, the record contains no evidence that, at the time of the communication, the defendants knew that their report to the police was false. Thus, plaintiffs failed in their burden to show abuse of the privilege based on a finding of malice.
In addition, the record does not establish that the defendants' communications to the proper authorities were fabricated, a product of then-imagination, or "so inherently improbable that only a reckless man would have put it in circulation." Kennedy, 05-1418 at p. 30, 935 So.2d at 689. Thus, the plaintiffs' failed in their burden *1121 to prove that defendants acted with reckless disregard for the truth and abused their privilege on that basis.
However, despite the trial court's finding that the defendants' misidentification was merely negligent, and the record's lack of support to establish an abuse of the asserted conditional privilege, the trial court committed reversible error by failing to apply the privilege. Even if the trial court had found gross negligence in the communications, and the record supported that finding, such a finding would not be sufficient to prove an abuse of the privilege asserted by defendants for reporting the possibility of criminal behavior.[3]See Kennedy, 05-1418 at p. 31, 935 So.2d at 689. Clearly, gross negligence is not within the tightly woven definition of reckless disregard adopted by Kennedy. See Kennedy, 05-1418 at p. 30, 935 So.2d at 689.

CONCLUSION
For the foregoing reasons, we hold that the defendants' negligent communications were conditionally privileged, we reverse the judgment of the trial court, and we dismiss the suit against the defendants. The costs of the trial and appeal are to be borne by the appellees, Wendell J. Callahan, Jr. and Jerome M. Cousan.
REVERSED AND RENDERED.
GUIDRY, J., dissents and assigns reasons.
GUIDRY, J. dissenting.
While I agree with the majority that Kennedy is dispositive of the matter before us, there are several key distinctions between Kennedy and the instant case. First, Kennedy was decided on review of a motion for summary judgment, whereas in the instant case, we have a fully developed trial record from which to determine the facts. Additionally, in Kennedy the defendants fully disclosed all of the known facts regarding the suspected wrongful acts in making a report to law enforcement, unlike the instant case where there is a misidentification of an alleged perpetrator and an alleged failure to disclose the suspect basis of that identification.
At trial Morris testified that he saw two African-American males run into a cardboard merchandiser in the front of the store and knock some movies down. When the men attempted to pick up the movies, Morris noticed that they could not bend at the waist or bend their legs. Morris stated that he got a good look at the face of one male, but could not see the face of the other. Morris indicated that the man whose face he saw was wearing a white t-shirt and long blue jeans; the other man was also wearing long blue jeans, but had on a dark colored t-shirt. Morris also indicated that both men had short hairstyles. Further, Morris stated that when he followed the two men from the store, they had difficulty walking because it appeared they had merchandise stuffed down the legs of their pants.
*1122 At the time Callahan and Cousan were pulled over by the sheriff's office, which was only approximately fifteen minutes from the time the shoplifters fled Circuit City, Callahan was wearing a white North Carolina t-shirt, baseball cap, and blue jean shorts and Cousan was wearing a Wendy's uniform, consisting of black pants and a dark green shirt, and had a distinctive afro hairstyle. Despite this marked difference in appearance, and despite the fact that Morris never actually saw the second man's face, he positively identified Callahan and Cousan as the perpetrators of the shoplifting at Circuit City. Additionally, Morris testified that the main basis for his identification of Cousan was the fact that he was with Callahan. However, more importantly, Morris neglected to provide the sheriff's officers with any of this information so that they could perform their own further independent investigation of the facts prior to concluding there existed probable cause to arrest Callahan and Cousan. Because his positive identifications were so inherently improbable under the circumstances, Morris was clearly reckless in communicating them to the sheriff's officers at the scene without further disclosure.
Additionally, with regard to Hines, he was not in the Circuit City store when the alleged shoplifting took place and clearly stated at trial that he never saw the faces of the men he followed from the area of the store. Further, when Hines stopped to retrieve the video games, he admittedly lost sight of the two men as they ran across the median toward the Wal-Mart shopping center. Hines proceeded to the Wal-Mart parking lot, noticed a vehicle leaving the parking lot, but continued to look for the individuals on foot. When Hines did not see the men he had been chasing, he proceeded to follow and report Callahan and Cousan's vehicle simply because he saw it leave the parking lot. Despite the break in his chase and his admitted inability to identify the faces of the perpetrators of the shoplifting, Hines nevertheless reported Callahan and Cousan's car to the sheriff's office as containing the shoplifting suspects. In so doing, he failed to disclose at that time the above circumstances, which could have been evaluated by the sheriff's officers in determining whether there existed a lawful basis to stop and arrest Callahan and Cousan. Hines admitted that he had reasonable doubt that these were the same men that he had been chasing, yet despite that doubt, he gave the sheriff's office the license plate number of Callahan and Cousan's car. Accordingly, Hines clearly acted with reckless disregard in reporting Callahan and Cousan's car to the sheriff's office as containing the suspects of the shoplifting.
Therefore, while the circumstances of the communication occasion a qualified privilege, namely the reporting of criminal activity and the identification of suspected criminals, Callahan and Cousan have clearly shown that under the specific facts of this case Circuit City abused that privilege. The record establishes that based on the circumstances known by both Morris and Hines, which were not shared with the sheriff's officers, only a reckless man would have given the statements they gave. Under the particular facts of this case, Circuit City clearly abused its privilege. Accordingly, I respectfully dissent from the majority's opinion.
HUGHES, J., dissenting.
It is respectfully submitted that a distinction should be drawn between false statements that send innocent people to jail, and mere name calling, and that a gross negligence standard should be used to analyze the former.
*1123 We may all agree that it's a good thing for citizens to report suspicious activity to the police without fear of civil litigation. By taking criminals off the streets and setting an example we prevent innocent people from suffering. But what happens when reports to the police cause innocent people to suffer? What happens when innocent people are handcuffed, taken to jail, and lose their jobs? Is it "modern" thought that it's better to punish an occasional innocent man than to allow the guilty to slip through the net?
In Kennedy v. Sheriff of East Baton Rouge, 935 So.2d 669 (La.2006), the supreme court, in the context of a "defamation" claim, extended to the privilege for the communication of alleged wrongful acts to an official authorized to protect the public from such acts the standard that to prove abuse of the privilege a plaintiff must show knowledge or reckless disregard as to the falsity of the offending speech, as set forth in Trentecosta v. Beck, 703 So.2d 552 (La.1997)
Yet Trentecosta involved a public official plaintiff in a pure defamation context. In Kennedy and in the instant case, we are dealing with private individuals who went to jail as a result of the false communication. This is not Oscar Wilde being called a name. This is sticks and stones, actual physical loss of liberty because of a false statement. The false statement, privileged generally to protect the innocent from potential suffering, thus causes actual suffering to the innocent.
By what standard is this privilege to be measured? As the Kennedy court acknowledged, a state's interest in compensating injury to individuals is greater in the case of private individuals than for public officials and public figures, because private individuals characteristically have less access to channels of effective communication to counteract false statements.
The supreme court in Kennedy found that for a harmed plaintiff to overcome the privilege, or show that the privilege had been abused, the plaintiff would be held to an "actual malice" standard; that is, that the false statement was made with knowing falsity or reckless disregard for the truth. The supreme court went on the hold that even proof of gross negligence would be insufficient to prove reckless disregard, citing Davis v. Borskey, 660 So.2d 17 (La.1995) and Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).
Again, however, the pronouncement in Davis v. Borskey involves a public official, and is dicta. ("Even if a public official plaintiff demonstrates that a defendant was grossly negligent . . . ")(emphasis supplied). Likewise, Masson involved a public figure. The Court held the public plaintiff could recover only by showing "actual malice," not "mere negligence." The term "gross negligence" was not addressed.
It is respectfully submitted that the law applied to a literary or political dust-up is procrustean when applied to an innocent private individual who ends up in jail as the result of a false statement. Gross negligence should not be excluded from the analysis when loss of liberty results. "Reckless" by definition does not rise to the level of intentional or knowing behavior. Supreme Court cases that included "reckless disregard" to water down the harsh actual malice standard should not be used to raise the bar for private individuals who suffer actual, physical damage.
The Kennedy court also acknowledged that the issue of whether a conditional privilege has been abused is generally a fact question for the jury or finder of fact.
In Kennedy a late-night fast food establishment especially geared up to take in as *1124 much cash as possible failed to recognize legal tender of the United States because the picture of Benjamin Franklin was "small", and given these doubts did not have the commonly used special pen to simply test the bill, which is exactly what the sheriff's office did in order to release plaintiff from custody. Instead, they shot from the hip and immediately called the police.
While we certainly want to excuse good faith, honest mistakes in reporting crimes, a more flexible justice would allow the issue of gross negligence to be considered by the fact finder when an actual loss of liberty occurs. False statements that send the innocent to jail should be scrutinized more closely than mere name calling, even while recognizing and protecting the privilege for reports to the police. A constitutionally based conditional or qualified privilege becomes meaningless when it results in the loss of the ultimate constitutional right, liberty. There should be no hesitation to call the police, but there should be some thought.
In the instant case I would affirm the findings of the trial court after a full trial on the merits for the reasons set forth by Judge Guidry in his dissent, and therefore I respectfully dissent.
NOTES
[1] The employees referenced in the petition were Morris, Hines, and Brad Adams, the individual who drove Morris to the scene of the arrest.
[2] Callahan and Cousan specified additional items of general and special damages, some of which included attorney fees related to the defense and expungement of criminal charges, costs of arrest, and cost of recovering an impounded vehicle.
[3] We note that the Kennedy case was decided after the trial court signed the judgment in the instant case. However, neither party disputes that Kennedy is applicable to the instant appeal. Further, we note that an appellate court is bound to adjudge a case before it in accordance with the applicable law existing at the time of its decision. Segura v. Frank, 93-1271, pp. 15-16 (La.1/14/94), 630 So.2d 714, 725, cert. denied, sub nom., Allstate Insurance Co. v. Louisiana Insurance Guaranty Association, 511 U.S. 1142, 114 S.Ct. 2165, 128 L.Ed2d 887 (1994). Even before Kennedy, plaintiffs were required to prove malice as part of their prima facie case. See Kennedy, 05-1418 at p. 4, 935 So.2d at 674; O'Conner v. Hammond Police Dept., 439 So.2d 558, 561 (La.App. 1 Cir.1983); Keppard v. AFC Enterprises, Inc., 00-2474, p. 7 (La.App. 4 Cir. 11/28/01), 802 So.2d 959, 965.