Freddie Dean FREEMAN, John Arthur
BOWDEN and Walter BOWDEN v.
STATE of Arkansas

CR 75-13                           527 S.W. 2d 909

Opinion delivered October 13, 1975

618

*Harold Hall*, Public Defender, by: *John W. Achor*, Dep. Public Defender, for appellants.

*Jim Guy Tucker*, Atty. Gen., by: *Gary Isbell*, Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Appellants Freddie D. Freeman, John Arthur Bowden and Walter Bowden were found guilty of the murder of W. C. Anderson in the perpetration of a robbery and sentenced to life imprisonment. For reversal of their conviction, they assert error in refusal to grant separate trials, in admission of the testimony of a physician, of a confession of Walter Bowden, and of photographs of, and testimony about, an automobile belonging to Freeman. We find reversible error in the admission of the confession.

Anderson was killed on December 29, 1973 in North Little Rock. On December 31, 1973, about 9:30 A.M., Lt. Tucker and Sgt. May of the North Little Rock Police Department went to Southern Farms, where they found Walter Bowden, whom they took to the Homicide Squad Room at the North Little Rock Police Department, after having given him warnings about his constitutional rights as to interrogation pursuant to the requirements of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1965). There they interrogated Walter[1] about his activities on the day of the homicide. When they were not satisfied with his answers, they obtained his consent to a polygraph examination, arranged for it to be conducted by Lt. Bob Bailey at Conway on New Year's Day, and held Walter in the North Little Rock jail overnight. Walter had been told that he was a suspect in the homicide, but had not been charged. Although the officers did not consider that Walter was under formal arrest at the time, they said he was incarcerated, he was not free to leave but was kept in a cell. The circuit judge quite correctly held that, in actuality, he had been arrested.

After the test, shortly after noon, Walter was returned to the jail in North Little Rock. About 2:30 P.M., a new interrogation was commenced, after a new warning had been given Walter. When asked if he wanted to contact an attorney, he stated that he did not, but would like to contact his uncle, Jim Lindsey. Walter was permitted to call Lindsey, told the officers his uncle was coming down, and said that he did not want to make any statement until Lindsey came. Lindsey had not arrived by 3:30. Walter told Tucker that he had knowledge of the crime, but didn't kill anyone and kept asking, "Well, I didn't kill anybody, what charge are you going to place against me?" Tucker then contacted Pulaski County Deputy Prosecuting Attorney Jim Hamilton, who came to the jail about 4:10 P.M. Tucker told Hamilton, "We have a murder". Hamilton was informed of what had taken place by Tucker, in particular the preliminary result of the polygraph test and Walter's statement and question about charges. Walter asked Hamilton, "When I give a statement,

---

[1]In order to simplify identification of the parties, we will hereafter refer to Walter Bowden as Walter, John Arthur Bowden as John and Freddie Dean Freeman as Freeman.

do you have any idea what I will be charged with?" or "When I give my statement, what's going to happen to me?" Hamilton had been told that Walter had said he was present but didn't kill anybody. Hamilton advised Walter that he could not make any promises but told Walter that if he had committed a crime, it was probably one that would not result in more than 21 years' incarceration. Hamilton then left and Tucker received an affirmative reply when he asked Walter if he wanted to give a statement. Tucker reread a statement of Walter's constitutional rights, after which Walter, who had then been in jail about 30 hours, made a statement admitting his participation in the robbery of Anderson, in planning it with Freeman, soliciting John's participation and going with both to the scene in Freeman's automobile, waiting for them and driving them away from the scene. The statement implicated both the others in the killing, but exonerated Walter from actual participation in person in the killing of Anderson in the perpetration of the robbery. Walter commenced the statement at 4:21 P.M., and by 4:36 P.M., it was completed, typed by Tucker and signed by Walter and by Tucker and May as witnesses.

Walter's version was that he was promised a 21-year sentence if he were to give a statement and testify against the other two and that he signed the statement because of this promise and the threat that he would get the death penalty if he did not. Both Hamilton and Tucker deny that any mention was made of the death penalty.

On January 8, 1974, Walter was charged with robbery by an information filed by another deputy prosecuting attorney. Hamilton had related what had happened at the North Little Rock police station to other deputy prosecuting attorneys and played a minimal part in the decision on the filing of charges against the three appellants in that he only conveyed information to those who made the decision. It was Hamilton's opinion, at the time, that Walter should be used as a witness against the others, because he had been cooperative. He stated that Walter continued to cooperate until he talked with the public defender. A first degree murder charge was filed against Freeman and John, but not Walter, on January 14. It was not until April 10 when an

amended information was filed that all three were charged with the murder.

Motions for severance were filed by all three on June 18, 1974. On July 3, the state demanded the death penalty and the motions to sever were granted. On July 23, upon the state's waiver of the death penalty, the state's motion to consolidate was granted and the order granting a severance set aside. On July 15, the prosecuting attorney had written a letter to the public defender, who had been appointed to represent all three appellants, in which he offered to waive the death penalty if Freeman and John entered pleas of guilty to the murder. He further offered to nolle prosequi the murder charge against Walter if he would plead guilty to the charge of robbery and to recommend a sentence of ten years and to waive the death penalty as to John and Freeman if he would testify against them should they plead not guilty. Walter declined this offer in a hearing before the circuit judge, in camera, on July 22.

In reviewing the admission of a confession over an objection for alleged involuntariness, we make an independent determination based upon the totality of the circumstances and reverse the action of the trial judge only when we find his finding to be clearly against the preponderance of the evidence. *Degler* v. *State*, 257 Ark. 388, 517 S.W. 2d 515. Of course, a confession given by an accused while in custody is presumed to be involuntary, and the burden of proving that it was actually voluntary rests upon the state. *Scott* v. *State*, 251 Ark. 918, 475 S.W. 2d 699; *Johnson* v. *State*, 248 Ark. 184, 450 S.W. 2d 564, (on petition for post-conviction relief) 249 Ark. 268, 459 S.W. 2d 56.

In order to be voluntary, a confession must have been made in the absence of threat of injury or promise of reward and free from the taint of official inducement proceeding from either hope or fear. When threats of harm or promise of favor or benefits are used to extort a confession, it is attributable to such influences and not voluntary. *Dewein* v. *State*, 114 Ark. 472, 170 S.W. 582; *Brown* v. *State*, 198 Ark. 920, 132 S.W. 2d 15. It must not be induced by promises, either express or implied, by the officer having the accused in custody or by any

other person in authority, and, if a confession is made under the influence of hope of mitigation of punishment excited by those in authority, it is inadmissible. *Hardin* v. *State,* 66 Ark. 53, 48 S.W. 904; *Brown* v. *State,* supra.

Even though we give full credit to the testimony of the deputy prosecuting attorney who talked with Walter that he made no promise to Walter and that he specifically stated that he had no authority to do so, the conclusion that Walter was justified in feeling that there was an implied promise of leniency is inescapable when we view all the circumstances, including the course of events following his confession. We must hold that the confession was involuntary and inadmissible.

We deem it unnecessary to consider the argument of the appellants regarding severance because we cannot anticipate that the question will arise again or the context in which it might arise, because of our holding as to Walter's confession. Two other questions raised by appellants will likely arise on retrial. The first is the contention that the testimony of Dr. James Harper Bledsoe about a bullet wound suffered by John was admitted in violation of the physician-patient privilege. The other relates to the admissibility of testimony pertaining to an automobile owned by Freeman.

The victim of the robbery was found slumped in his chair. In his lap there was a .38 caliber pistol that he been fired recently. After finding this situation, Patrolman Paul Hale of the North Little Rock Police Department went to the University Medical Center and arrested John, whom he found lying on an x-ray table. John had been taken to the emergency room there about noon. Lt. Tucker came there about 5:00 P.M. and witnessed the administration of a trace metal test on John. Two black males had been seen between 11:00 and 11:30 A.M. leaving Anderson's used car lot under circumstances from which it might have been inferred that one of them had been injured. Gunshots had been heard from the lot. Dr. Bledsoe testified that he was the physician at the University Medical Center who examined and treated John there on December 29, 1973 and that any inquiry or examination he made of John was for the purpose of treating

and prescribing for him. Over the objections of John's attorney, Bledsoe was permitted to testify that John had suffered a gunshot wound to his lower abdomen inflicted by a large caliber bullet (larger than .22, perhaps as large as .45), that there was no exit wound, that the bullet was not then removed, because it was too dangerous to the patient to do so at the time, that it should have been removed when John's condition was more stable, that John was his patient for nine or ten days, and, according to his records, it had not yet been removed.

The physician-patient privilege is incorporated into Ark. Stat. Ann. § 28-607 (Supp. 1973), which provides that no person authorized to practice medicine or surgery shall be compelled to disclose any information acquired from his patient which was necessary to enable him to prescribe as a physician or do any act as a surgeon. The privilege is purely statutory. *Wimberly* v. *State,* 217 Ark. 130, 228 S.W. 2d 991; Norton, Privileges, 27 Ark. Law Review 211 (1973). In *Ragsdale* v. *State,* 245 Ark. 296, 432 S.W. 2d 11, we held the statute applicable in criminal cases, but there we did not have a situation in which the provisions of a later statute, Ark. Stat. Ann. § 42-501 (Repl. 1964) were applicable. Without having considered the latter statute's application where the accused was the patient, we have said that the former was not intended to be the means of protecting a criminal from just punishment. *Edwards* v. *State,* 244 Ark. 1145, 429 S.W. 2d 92; *Wimberly* v. *State,* supra. Even so, the language of *Wimberly,* where the victim was the patient, rather than the accused, is fully applicable here, where the accused was the patient invoking the privilege. We said:

> . . . a construction which would serve as a cloak for crime should not be placed upon a statute which as we have said, was enacted "to prevent physicians from disclosing to the world the infirmities of their patients." The State has a vital interest in the protection of its citizens from acts of violence. It would be unreasonable to say that a physician must report his treatment of a gunshot wound to a peace officer, but that the State cannot call him to testify as to the nature, location and extent of such wounds in a court of law.

We have no hesitation in holding that, for the policy reasons quoted, if for no other, the privilege stated in Ark. Stat. Ann. § 28-607 (which was, insofar as material here, incorporated in the Revised Statutes of 1838) is qualified by the provisions of Ark. Stat. Ann. § 42-501 — 503 (Repl. 1964), adopted in 1949. See Norton, Privileges, 24 Ark. Law Review 211, 212. But the qualification must be limited to that information required of a physician or surgeon called upon to render first aid treatment. Ark. Stat. Ann. § 42-502 requires that such a physician or surgeon report to the office of the county sheriff or to a regular member of the police force, the name, age, sex, color, and location of the injured person and the name of the person bringing the patient in for treatment. Here the court permitted the examination of this witness to extend beyond appropriate bounds. Dr. Bledsoe's description of the wound and its location was not in violation of the privilege, but the statute requiring the report certainly does not call for the surgical treatment prescribed or the fact that the bullet had not been removed. The privilege operates to exclude information obtained for diagnosis and treatment by means other than communications by the patient, diagnosis for treatment or surgery as well as the information on which it is based, treatment prescribed as a result of the information gained, and descriptions of the patient's condition or the extent of his injuries. See *Ragsdale* v. *State*, 245 Ark. 296, 432 S.W. 2d 11; *Brotherhood of Railroad Trainmen* v. *Long*, 186 Ark. 320, 53 S.W. 2d 433; *National Benevolent Society* v. *Barker*, 155 Ark. 506, 244 S.W. 720; *St. Louis, I. M. & So. Ry. Co.* v. *Fuqua*, 114 Ark. 112, 169 S.W. 786; *Brown* v. *Brown*, 181 Ark. 528, 27 S.W. 2d 85; *Duff* v. *Ayers*, 156 Ark. 17, 246 S.W. 508; *Poinsett Lumber & Mfg. Co.* v. *Longino*, 139 Ark. 69, 213 S.W. 15; *Coca-Cola Bottling Co.* v. *Strather*, 192 Ark. 999, 96 S.W. 2d 14. Thus, the doctor's testimony about the danger of removal of the bullet, the prospect of removal, and the failure to remove it should have been excluded.

This brings us to the very difficult problem relating to the seizure of Freeman's automobile and the admission of photographs of it taken after seizure. A motorist, whose attention was attracted by commotion at Anderson's used car lot at the time of the robbery, saw two black males, one of whom was bent over holding his stomach, run from Ander-

son's office to an automobile, which was driven away after both had gotten into it. He followed this car for one block. He described it as a gold Buick with white top and black pin stripes running from the door to the back taillight. He said he had never seen a car striped as this one was. He identified photographs that the police had taken of Freeman's automobile as showing the one he had described, and said that he had seen it on the North Little Rock Police Department's parking lot between the time of the robbery and the time of trial. This witness said he had been present when it was photographed at the parking lot. Another witness who had been in the car with the motorist also identified the vehicle in the photograph as the one in which he saw three black males fleeing the scene. He described the color of the vehicle as "brownish and white". Still another motorist, who looked toward the used car lot when he heard two shots, saw the fleeing males get into a gold car a block away. He testified that the photographs showed a vehicle that was the "right color" and that one of the defendants "looked like" one of those he saw fleeing. A pedestrian, who had been about a block away from the lot only saw the rear of the car from a distance but said that one of the photographs looked like the car he saw. A witness, who was in the emergency room at the University of Arkansas Medical Center when John was brought there, identified Freeman as the person who brought him. He said that after giving a clerk there some information Freeman left in a car he identified from the photographs that had been introduced in evidence. Another witness corroborated the testimony and described the vehicle in which Freeman departed as a gold Buick Wildcat.

On January 2, 1974, Lt. Tucker and Sgt. May, having a warrant for the arrest of Freeman, went to 1319 Gaines Street in Little Rock. There Tucker observed a 1969 Buick Wildcat bearing Arkansas license place DLY 571 parked behind the residence at that address. The color of the body of the automobile was gold. It had a white top. It matched the description given by witnesses. Tucker and May saw a negro male and two females get into another automobile in front of this residence and drive away. They followed the vehicle about two blocks. Seeing that the male was Freeman, they

stopped the car in which he was riding and arrested him. After the arrest, the officers, with Freeman in custody, returned to 1319 Gaines Street and observed that the vehicle they had seen at the rear of the premises remained there. Lt. Tucker thought the vehicle should be impounded. Tucker advised Freeman that they were going to seize the car for identification purposes. Tucker prepared to call a wrecker to tow the vehicle away, but after being told that he could either let one of the officers drive the car or he would be "out" the towing charge, Freeman stated that he did not want to pay for a wrecker and that one of the officers could drive the vehicle to North Little Rock Police Headquarters. It was taken there by Sgt. Hightower. Photographs of the vehicle, later introduced in evidence, were then taken. Thereafter, it was released to Freeman's sister at his request.

Appellant's motion to suppress these photographs was denied. The state endeavors to justify the seizure as incident to his arrest. But we cannot agree that this seizure falls within the ambit of seizures permissible as such. It has long been recognized that different standards for determining reasonableness of searches are applied where automobiles rather than dwelling houses, places of business or other structures are involved, because of the mobility of vehicles. See *Carroll* v. *United States,* 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1924). No reason appears why the guidelines for testing reasonableness of seizure of automobiles should be different than those followed in regard to searching them. See generally *Chambers* v. *Maroney,* 399 U.S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419, rehearing denied 400 U.S. 856, 91 S. Ct. 23, 27 L. Ed. 2d 94 (1969).

The validity of a warrantless search, and hence a seizure, is, first dependent upon the existence of probable cause, unless it is incident to a lawful arrest. It cannot seriously be urged that the seizure of Freeman's automobile was incident to his arrest two blocks away from where he was first seen and where the officers had earlier observed his car. In order to justify a seizure on this ground, the vehicle must have been in the immediate vicinity of the arrest, which has been confined to the area within the immediate control of the person arrested, i.e., the area from which he might gain possession of a weapon or other instrument which might be useful in effec-

ting an escape or destructible evidence. *Chimel* v. *California,* 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969), rehearing denied 396 U.S. 869, 90 S. Ct. 36, 24 L. Ed. 2d 124 (1969); *Coolidge* v. *New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1970). See also, *Steel* v. *State,* 248 Ark. 159, 450 S.W. 2d 545; *Vale* v. *Louisiana,* 399 U.S. 30, 90 S. Ct. 1969, 26 L. Ed. 2d 409 (1970); *James* v. *Louisiana,* 382 U.S. 36, 86 S. Ct. 151, 15 L. Ed. 2d 30 (1965).

We do not think it can be said that there was not probable cause for the seizure of the automobile. This alone, however, cannot justify a warrantless seizure, not incident to arrest. An additional requirement needed to justify the seizure without first securing a warrant under the "automobile exception" is the existence of exigent circumstances. *Coolidge* v. *New Hampshire,* supra; *Chambers* v. *Maroney,* supra. The state bore the burden of showing the existence of such exigencies. *Coolidge* v. *New Hampshire,* supra; *Vale* v. *Louisiana,* supra. It seems that in order to do so in this case, it must have been shown that it was not practicable under the existing circumstances to secure a warrant. *Coolidge* v. *New Hampshire,* supra; *Vale* v. *Louisiana,* supra. The vehicle was not stopped or abandoned on the open highway. It was not taken into police custody to safeguard the owner's property or to protect the public safety. The possible connection of the vehicle with the Anderson murder was known to the officers when they initially saw it at the Gaines Street address. It was not at the time being used for any illegal purpose and Freeman, if he was trying to escape and avoid arrest, was not using it for that purpose. There was no way that he could have had access to the car after he was arrested. Lt. Tucker and Sgt. May participated in the arrest and at least two other officers, one of whom drove the vehicle to North Little Rock, were en route. There was no indication that there was any danger that the other occupants of the vehicle from which Freeman was taken might remove the vehicle from the premises before a warrant for its seizure could be obtained and executed, even if we should assume that these females were his confederates. If that danger did exist, however, no reason appears why the two officers other than Tucker and May could not have maintained a guard sufficient to prevent the removal of this evidence, or why additional officers could

not have been summoned to lend assistance in this respect. The precepts of *Coolidge* prevent our holding that exigent circumstances justified the seizure. See also, *Trupiano* v. *United States*, 334 U.S. 699, 68 S. Ct. 1229, 92 L. Ed. 1663 (1947); *Vale* v. *Louisiana*, supra.

*Coolidge* likewise bars our sustention of the seizure under the "plain view" doctrine. Because of the fact that in most cases any evidence seized by the police is in plain view at the moment of seizure, the *Coolidge* court stated the problem as identification of the circumstances in which plain view has legal significance rather than being the normal concomitant of any search, legal or illegal. The cases upholding searches and seizures under the "plain view" doctrine have one factor in common, i.e., the police officer had a prior justification for an intrusion in the course of which he came upon a piece of evidence incriminating the accused. The "plain view" exception cannot justify police seizure where there is an absence of exigent circumstances which effectively nullify the opportunity to obtain a warrant in advance, where a trespass is necessary to effect the seizure and where the seized object is not contraband, stolen goods or dangerous in itself. In this case the authorities had ample time to obtain a warrant and the circumstances did not necessitate immediate seizure. On the present record, we cannot say that the photographs of the car were not an exploitation of an illegal seizure. See *Durham* v. *State*, 251 Ark. 164, 471 S.W. 2d 527; *Wong Sun* v. *U.S.*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). There is a possibility that we might have considered this as harmless error, if it were not necessary to reverse the case on other grounds. Still, it seems where error is of constitutional proportions, it is not harmless unless the evidence supporting a conviction is otherwise overwhelming. Consequently, we could not, on this appeal, since a retrial is necessary, treat the admission of this evidence as harmless error. We do not mean to indicate, however, that testimony of the officers about their observation of the vehicle from the street and its description as then observed would not have been admissible under the "plain view" doctrine. See *United States* v. *Corbett*, 518 F. 2d 113 (8 Cir., 1975).

Of course, it cannot be argued seriously that Freeman's

agreement that the police officer could drive the car to the police station constituted consent to its seizure under the circumstances. The only alternative was that it would be towed there at his expense.

The judgment is reversed and the cause remanded for a new trial.

Roy, J., not participating.