19 So.3d 557 (2009)
Christopher MITCHELL
v.
Dr. Paul O. VILLIEN, Jr., The City of New Orleans and Detective John Hunter in his Official Capacity as a New Orleans Police Officer.
No. 2008-C-1470.
Court of Appeal of Louisiana, Fourth Circuit.
August 26, 2009.
*559 Gary W. Bizal, Pierce & Bizal, New Orleans, Louisiana, for Christopher Mitchell.
C. William Bradley, Jr., Richard S. Crisler, Natalie J. Parria, Bradley, Murchison, Kelly & Shea LLC, New Orleans, Louisiana, for Paul O. Villien, Jr., M.D.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge EDWIN A. LOMBARD, Judge PAUL A. BONIN).
BONIN, Judge.
On August 29, 2002, the Orleans Parish coroner, after performing an autopsy, concluded that Cathy Hall was not the victim of a gunshot wound. On the preceding day, NOPD Homicide Detective John Hunter had arrested Ms. Hall's boyfriend, Christopher Mitchell, for second-degree murder after a report to NOPD from emergency room physician Dr. Paul Villien, Jr., that Ms. Hall suffered a gunshot wound. Mr. Mitchell sued Dr. Villien[1] for defamation, false arrest and imprisonment. *560 After discovery, Dr. Villien moved for dismissal by summary judgment, which was denied by the trial court.[2]
For the reasons which follow, we now reverse, grant judgment in favor of Dr. Villien and against Mr. Mitchell, dismissing his claims with prejudice. We also remand the case to the district court for further proceedings against the remaining defendants.

I
Mr. Mitchell resided with his long-time companion, Ms. Hall, in a Mid-City apartment near Mercy Hospital. Over the course of several days, Ms. Hall's physical condition appeared to deteriorate. Mr. Mitchell observed that Ms. Hall was bleeding from a head wound, which he thought was caused from a fall. Without a telephone, he walked to the hospital to request an ambulance, but was instructed he must request it by using a nearby pay phone, which he did. He then walked back to their apartment and met the emergency unit. Ms. Hall was alive, but not coherent when the unit arrived. She was, however, dead upon arrival at Mercy.
Dr. Villien, the emergency room physician on duty, examined Ms. Hall's body and observed a wound or hole in her forehead from which she had been bleeding copiously. This 1-cm-in-diameter deep round wound on her forehead was suggestive of a penetrating wound such as a gunshot or other bone-piercing object.[3] Additionally, a wound on the back of her head demonstrated ecchymosis and soft-tissue "boggy" swelling, which would be consistent with a gunshot projectile that entered the forehead but did not exit the back of the head.
Dr. Villien instructed his staff to contact the police department and report the matter. In response to the notification, Detective Hunter arrived at the emergency room, accompanied by another homicide detective. Dr. Villien personally explained to the homicide detective that he believed that the wound on Ms. Hall's forehead was from a gunshot. He demonstrated to the detectives by placing his finger in the hole. He showed them the condition of the back of her head, which Detective Hunter recognized from his own experience as appearing the same as when a bullet has not exited the head.
*561 Mr. Mitchell was still at Mercy when the detectives arrived. After speaking with Dr. Villien and viewing Ms. Hall's body, Det. Hunter interviewed Mr. Mitchell at the hospital. Because the detective had no basis at that time to question Dr. Villien's report of a gunshot wound, many of Mr. Mitchell's answers to the investigator's questions appeared inconsistent, contradictory, and inculpatory. After leaving the hospital, Det. Hunter took Mr. Mitchell to a police station; after subsequent investigation, Det. Hunter arrested him and booked him into parish prison. Throughout the interviews, and even after being cautioned with his Miranda rights, Mr. Mitchell was fully cooperative with the investigation. During his deposition, Det. Hunter emphasized that he would not have arrested Mr. Mitchell except that Dr. Villien had expressed his opinion that Ms. Hall was a gunshot victim.
Ms. Hall's body was immediately transferred to the Orleans Parish coroner. Within hours, the examining coroner reported to Det. Hunter that there was no gunshot wound. After visiting and viewing the apartment with Det. Hunter, the coroner concluded that Ms. Hall died of natural causes. This prompt official determination was immediately communicated to Det. Hunter, but it did not result in Mr. Mitchell's immediate release from incarceration.
We have no information why this determination was not communicated to a magistrate at a statutory 48-hour hearing, or whether such a hearing was even conducted.[4] Not until October 4, 2002, the date of the scheduled preliminary hearing, was the charge of second-degree murder of Ms. Hall dropped and Mr. Mitchell released from parish prison.[5]

II
Dr. Villien assigns three errors to the district court in its failure to dismiss the claims against him by summary judgment. First, he urges that Dr. Villien held a "qualified privilege" when he dutifully reported his diagnosis of the gunshot wound in compliance with La. R.S. 14:403.5.[6] Second, Dr. Villien contends that Mr. Mitchell failed to allege that Dr. Villien restrained him, so that the false arrest claim should have been dismissed by summary judgment. Third, Dr. Villien argues that the New Orleans Police Department's "independent investigation" of the death of Ms. Hall "broke the chain of causation," so that as an intervening cause, that investigation obviated Mr. Mitchell's claim for negligence or false imprisonment against Dr. Villien.
Mr. Mitchell contends that "[a]lthough Dr. Villien enjoys a conditional or qualified *562 privilege in connection with the reporting of a crime," his reckless disregard of the truth negates that privilege. Additionally, he contends that Dr. Villien is liable for the police department's actions because Detective Hunter testified that he would not have arrested Mr. Mitchell "but for" Dr. Villien's statement "that the deceased had a gunshot wound to the head."

III
Appellate courts review summary judgments de novo and utilize the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Kennedy v. Sheriff of East Baton Rouge Parish, 05-1418, pp. 25-26 (La.7/10/06), 935 So.2d 669, 686; Brungardt v. Summitt, 08-0577 at p. 5 (La.App. 4 Cir. 4/8/09), 7 So.3d 879, 883.
A court must grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." Kennedy, 05-1418, p. 25 (La.7/10/06) 935 So.2d 669, 686, citing La. C.C.P. art. 966(B). The summary judgment procedure is designed to secure the just, speedy and inexpensive determination of civil actions and is now favored. La. C.C.P. art. 966(A)(2). Id., 05-1418, pp. 25-26, 935 So.2d at 686.
Pertinent to the inquiries before us regarding the allocation of burdens of proof on a motion for summary judgment, La. C.C.P. art. 966(C)(2) provides:
The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
A "genuine issue" is a "triable issue," or one on which reasonable persons could disagree. Kennedy, 05-1418 at p. 26, 935 So.2d 686-687, citing Champagne v. Ward, 03-3211, p. 5 (La.1/19/05), 893 So.2d 773, 777. "A "material fact" is a fact, the existence or non-existence of which may be essential to plaintiffs cause of action under the applicable theory of recovery." Id.
"By definition, a statement is defamatory if it tends to harm the reputation of another so as to lower the person in the estimation of the community, deter others from associating or dealing with the person, or otherwise expose the person to contempt or ridicule." Costello v. Hardy, 03-1146, p. 13 (La.1/21/04), 864 So.2d 129, 139; see also Trentecosta v. Beck, 96-2388, p. 10 (La.10/21/97), 703 So.2d 552, 559; and RESTATEMENT (SECOND) OF TORTS § 559 cmt. e (1977). In Louisiana jurisprudence, defamatory words have traditionally been divided into two categories: those that are defamatory per se and those that are susceptible of a defamatory meaning. Brungardt v. Summitt, 08-0577 at pp. 8 (La. App. 4 Cir. 4/8/09), 7 So.3d at 885, citing Costello, 03-1146, p. 13 (La.1/21/04), 864 So.2d 129, 139, supra; see also Madison v. Bolton, 234 La. 997, 102 So.2d 433, 438 (1958).
"Words which expressly or implicitly accuse another of criminal conduct, *563 or which by their very nature tend to injure one's personal or professional reputation, without considering extrinsic facts or circumstances, are considered defamatory per se." Brungardt, supra, 08-9577 at p. 8, 7 So.3d at 885, citing Costello, supra, 03-1146 at pp. 13-14, 864 So.2d at 140. "If publication of words that are defamatory per se is proven, the elements of falsity, malice, fault and injury (or fault) are presumed, but may be rebutted." Id. "Injury may also be presumed." Id. "When the words at issue are not defamatory per se, a plaintiff must prove, in addition to defamatory meaning and publication, falsity, malice (or fault) and injury." Costello, 03-1146 at p. 12, 864 So.2d at 140.
To prevail on his defamation claim against Dr. Villien, Mr. Mitchell bears the burden of affirmatively proving (1) a false and defamatory statement by Dr. Villien; (2) an unprivileged publication to a third party; (3) negligence by Dr. Villien (as set forth in the RESTATEMENT (SECOND) OF TORTS § 580B); and (4) resulting injury. "If even one of these required elements is found lacking, the cause of action fails." Kennedy, 05-1418 at p. 16, 935 So.2d at 681, citing Costello, supra, 03-1146 at 12, 864 So.2d at 140; Trentecosta, supra, 96-2388, p. 10 (La.10/21/97), 703 So.2d 552, 559.
In defamation tort litigation, summary judgment has been particularly useful as a "procedural tool and an effective screening device for avoiding the unnecessary harassment of defendants by unmeritorious actions which threaten the free exercise of rights of speech." Kennedy, 05-1418, p. 25, 935 So.2d at 686, citing Mashburn v. Collin, 355 So.2d 879, 890-891 (La.1977). In order to defeat summary judgment, a plaintiff alleging defamation must produce evidence of sufficient quality and quantity to demonstrate that he likely will be able to meet his burden of proof at trial. Kennedy, 05-1418 at p. 25 fn. 17, 935 So.2d at 686, citing Sassone v. Elder, 626 So.2d 345, 351 (La.1993).
In our review of Dr. Villien's motion for summary judgment, we must determine first whether the speech of Dr. Villien was protected by one or more privileges from being characterized as defamatory. Second, we must determine whether, if a privilege exists, Mr. Mitchell has produced evidence of sufficient quality and quantity to show he is likely to meet the burden of proof at trial that Dr. Villien abused his privilege when he reported a suspected crime to the police. Our Supreme Court in Kennedy court set forth a two-step process for determining whether a conditional privilege exists.
In the first step, it must be determined whether the attending circumstances of a communication occasion a qualified privilege. If so, the plaintiff must show in the second step that the privilege has been abused. A determination of whether the privilege has been abused requires an examination of the grounds for abuse, that is, malice or lack of good faith ... The first step is generally determined by the court as a matter of law, but the second step of determining abuse of a conditional privilege is generally a fact question for the jury, unless only one conclusion can be drawn from the evidence.
Kennedy, 05-1428 at p. 18, 935 So.2d at 682; Callahan v. Circuit City Stores, Inc., 06-1663, p. 5 (La.App. 1 Cir. 10/10/07), 971 So.2d 1116, 1119.
The "fault" requirement is generally referred to in the jurisprudence as malice, either actual or implied. "The practical effect of the defendant's assertion of the conditional or qualified privilege is to rebut the plaintiffs[sic] allegation of malice, or reckless disregard, and to place the burden of proof on the plaintiff to establish *564 abuse of the asserted privilege." Kennedy, 05-1418 at p. 20, 935 So.2d at 683.

IV
Following the Kennedy prescription for determining whether defamation occurred, we first must decide if the circumstances of the utterance occasion a conditional privilege, whether statutorily (La. R.S. 14:403.5) and/or judicially created (Kennedy incorporating RESTATEMENT (SECOND) OF TORTS. As this Court recently noted in Roux v. Pflueger, 09-009, p. 3 (La.App. 4 Cir. 7/8/09), 16 So.3d 590, 594, "even when a plaintiff makes a prima facie showing of the essential elements of defamation, recovery may be precluded if the defendant shows either that the statement was true, or that it was protected by a privilege," citing Doe v. Grant, 01-0175, p. 9 (La.App. 4 Cir. 1/29/03), 839 So.2d 408, 416. If we find as a matter of law that such a conditional privilege existed for Dr. Villien, we must determine whether Mr. Mitchell can show that there exists a material fact in dispute on the issue of abuse of privilege to preclude summary judgment.
La. R.S. 14:403.5 is the specific statute on which Dr. Villien relies for asserting that his communication to Det. Hunter was privilege. Adopted in 1997, the statute provides:
A. The purpose of this Section is to aid law enforcement in combating violent crime through the rapid identification and reporting of all gunshot wounds or injuries treated by any medical professionals, practitioners, or associated personnel.
B. In every case of a gunshot wound or injury presented for treatment to a medical professional, practitioner, or associated person, that professional, practitioner, or associated person shall make an oral notification to either the sheriff of the parish in which the wounded person was presented for treatment, or the chief or superintendent of police in the municipality in which the wounded person was presented for treatment immediately after complying with all applicable state and federal laws, rules, and regulations related to the treatment of emergencies and before the wounded person is released from the hospital. A written notation of this action shall be made on the emergency record.
C. The provisions of this Section shall not apply to any wounds or injuries received from the firing of an air gun.
D. Any report of a gunshot wound or injury required to be reported by this section which does not result in criminal prosecution shall not become public record and shall be destroyed by the law enforcement agency receiving the information.
E. Any person who fails to file a report under this Section shall be fined not more than five hundred dollars or imprisoned for not more than six months, or both. Any person who knowingly files a false report under this Section shall be fined not more than five hundred dollars or imprisoned for not more than six months, or both.
Dr. Villien encounters two problems when he seeks to rely upon this mandatory reporting statute as the source of his immunity. The first is, of course, the fact that there was no actual gunshot wound to be reported. The second is that the statute contains no immunity provision for the medical reporter. Dr. Villien, acknowledging these problems, forcefully argues that if the statute does not confer *565 immunity even for his mistakenly reporting a gunshot wound, the law would unfairly compel him to navigate between the Scylla and Charybdis[7] of civil liability and criminal liability.
We have reviewed the legislative history of the adoption of the statute and related legislation. "One particularly helpful guide in ascertaining the intent of the legislature is the legislative history of the statute in question and related legislation." Theriot v. Midland Risk Ins. Co., 95-2895, pp. 3-4 (La.5/20/97), 694 So.2d 184, 186-87
The starting point in the interpretation of any statute is the language of the statute itself.... Their meaning may be sought by consulting other laws on the same subject matter.... Where a part of an act is to be interpreted, it should be read in connection with the rest of the act and all other related laws on the same subject.... We have long held that the paramount consideration in interpreting a statute is ascertaining the legislature's intent and the reasons that prompted the legislature to enact the law.
State v. Antoine, 98-369, p. 5 (La.App. 3 Cir. 10/28/98), 721 So.2d 562, 564 (citations omitted). During the 1997 legislative session, the New Orleans District Attorney spoke in support of Sen. John Hainkel's bill to mandate the reporting of gunshot wounds:
The problem is that individuals are being shot and brought to the hospital and leaving the hospital. They are on a wanted list and may be the perpetrator of a serious crime.... [T]his is an attempt to have the authorities notify[sic] if a wanted subject is brought into the hospital emergency room as a victim of a shooting or stabbing.
Louisiana Senate Committee on Judiciary, Sect. C, S.B. 308 (statement of Harry Connick on May 6, 1997). The bill when proposed did include the following immunity or privilege provision:[8]
E. No cause of action shall exist against any person who in good faith makes a report pursuant to this Section, cooperates in an investigation by any agency, or participates in any judicial proceeding resulting from such report.
This provision was deleted from the bill, as legislators expressed their intention to place the immunity provision in the Civil Code rather than the Criminal Code. La. Senate Comm. On Judiciary, Sect. C, S.B. 308 (statement of Sen. J. Lomax Jordan, Jr., on May 6, 1997). The statute was adopted without the immunity provision, but the provision never found its way into the Civil Code. The resulting absence of an expressed immunity provision in a statute mandating medical reporting is an anomaly, both in Louisiana and other states.
Louisiana law mandates medical reporting in at least three other instances, all of *566 which confer legislative immunity upon the mandated reporter: (1) burn wounds, La. R.S. 14:403.4; (2) elder/neglected adult abuse, La. R.S. 14:403.2, 15:1504(B), and (3) child abuse, La. Ch. C. art. 611.
In La. R.S. 14:403.4, which requires physicians to report burn injuries and wounds, the stated purpose of the burn-reporting statute is to "combat arson through the rapid identification and apprehension of suspected arsonists who may suffer burn injuries through the commission of their crimes." Physicians are subject to penal fines identical to that of La. R.S. 14:403.5, but they enjoy statutory immunity: no cause of action is permitted against a reporter.[9]
Similarly, physicians are mandatory reporters of suspected abuse of neglected adults or the elderly, and the legislature provided express immunity from civil or criminal liability for a physician who reports in good faith. See La. R.S. 14:403.2; La. R.S. 15:1504(A).[10] "No cause of action shall exist against any person who in good faith makes a report..." (B).
La. Ch. C. art. 611[11] requires mandatory reporting of suspected child abuse and provides express immunity from civil or criminal liability for a physician who reports in good faith. A mandatory reporter is "any individual who provides health care services, including a physician, surgeon..." La. Ch. C. art 603(15)(a). See La. Ch. C. art. 611(A)(1)(a).[12] No cause of action lies against the reporter.
The issue of immunity for a physician mandatorily reporting suspected child abuse pursuant to La. Ch. C. arts. 603(13) and 609-611 was litigated in the First Circuit in Vincent v. Milligan, 04-1207 (La. App. 1 Cir. 6/10/05), 916 So.2d 238, wherein the court found that "good faith *567 is presumed and the plaintiff has the burden to allege the facts needed to defeat statutory immunity." Id., p. 242.
The Second Circuit affirmed the immunity for a physician reporting suspected child abuse pursuant to La. Ch. C. art. 611, stating: "the immunity afforded the mandatory reporters is meant to encourage those with reasonable cause for suspicion to report suspected cases, free of the chilling effect presented by the threat of lawsuits." S.G. v. City of Monroe, 843 So.2d 657, 662 (La.App. 2 Cir.4/11/03).[13]
Unlike a member of the general public, a physician while performing his/her medical duties works under a rubric of physician-patient confidentiality. La.R.S. 13:3734 states:
E(2) No health care provider ... shall be held civilly or criminally liable for the disclosure of a patient's records ... to the extent permitted by Louisiana Code of Evidence Article 510(B)(2)(i) when that disclosure is made in accordance with R.S. 13:3715.1.
See Arsenaux v. Arsenaux, 428 So.2d 427, 429 (La.1983); Our Lady of the Lake Regional Medical Center v. E.R., 03-1185, p. 5 (La.App. 1 Cir. 4/2/04), 879 So.2d 167, 170 (discussing La. R.S. 13:3734 and the patient's waiver of privilege of confidentiality when his/her medical condition or medical treatment has been put at issue in a lawsuit); Jackson v. Dendy, 93-0905, p. 3 (La.App. 1 Cir. 6/24/94), 638 So.2d 1182, 1183 (discussing 42 U.S.C. § 29 0ff-2 (Patient Confidentiality Law)); see also American Medical Association, Code of Medical Ethics, Opinions 5.05-5.09[14]; World Medical Association International Code of Medical Ethics.[15]
In the physicians' circumstances, a mandatory reporting requirement is necessary to exempt them from their professional obligations of secrecy. See D.V. Snyder, Disclosure of Medical Information under Louisiana and Federal Law, 65 Tul. L.Rev. 169 (1990). The matters which Louisiana law mandates physicians to report are almost always explicit or implicit accusations of the commission of a crime.[16] An accusation of the commission of a crime is defamatory per se. Costello, supra, 03-1146 at 13-14, 864 So.2d at 140; Cangelosi, supra, 390 So.2d 196, 198 (La. 1980); Brungardt, supra, 08-0577 at p. 8, 7 So.3d at 885; Becnel v. Boudreaux, 340 *568 So.2d 687 (La.App. 4th Cir.1977). From a policy perspective, if the physician's report is accurate and a crime was committed, he or she would have no need of immunity, because truth is its own defense to the otherwise defamatory statement. La. R.S. 13:3602; see also Otero v. Ewing, 165 La. 398, 406, 115 So. 633, 636 (1928) and Romero v. Thomson Newspapers (Wisconsin), Inc., 94-1105, p. (La.1/17/95), 648 So.2d 866, 870. Immunity or privilege is therefore most needed when the physician, as here, mistakenly files a report.
Forty-four other states and the District of Columbia join Louisiana in having statutes expressly compelling doctors and healthcare workers to report suspected gunshot wounds to local law enforcement agencies. For instance, the Illinois statute requires doctors to report "any injury resulting from the discharge of a firearm" if the victim is not accompanied by a law enforcement officer. 20 ILCS 2360/3.2. Similarly, South Carolina instructs physicians that "no report is necessary if a law enforcement officer is present with the victim while treatment is being administered." S.C.Code 1976 § 16-3-1072. Most states use a variant of "immediately" to specify the time during which such information must be reported. For example, Montana law requires a written report "within 24 hours after initial treatment or first observation of the wound," MT Stat. 37-2-302. West Virginia requires an initial telephone report "followed by a written report delivered ... within forty-eight hours." W. Va.Code § 61-2-27; see also Cal.Penal Code § 11160(b)(2). Iowa compels a report "at once but not later than twelve hours thereafter." I.C.A. § 147.111.
Twenty-five of the states that require doctors to report gunshot wounds have express grants of immunity from civil or criminal liability arising from reports made pursuant to the statutes.[17]
We read La. R.S. 14:403.5, this legislative anomaly within Louisiana statutory law,[18]in pari materia with other statutes and our Supreme Court's holding in Kennedy, which incorporates pertinent sections of RESTATEMENT (SECOND) OF TORTS, to evaluate the broader protection afforded any person, including an emergency-room *569 physician when he is mandated by law to report what he believes to be a crime.
We now examine whether Dr. Villien is immunized conditionally by the general provisions for immunity set forth in RESTATEMENT (SECOND) OF TORTS § 580B and judicially adopted in Kennedy:
One who publishes a false and defamatory communication concerning a private person ... is subject to liability, if, but only if, he
(a) knows that the statement is false and that it defames the other,
(b) acts in reckless disregard of these matters, or
(c) acts negligently in failing to ascertain them.
Kennedy, 05-1418 at p. 15, 935 So.2d at 681.
A person who reports suspected criminal activity (not only gunshot injuries) "to officials authorized to protect the public from such acts," RESTATEMENT (SECOND) OF TORTS §§ 580B, enjoys a conditional privilege apart from the professional communications or protected relationships set forth hereinabove. This privilege requires the reporter to communicate information which he believes to be true. Kennedy, 05-1418 at p. 19, 935 So.2d at 682-83, and cases cited therein.
As explained in Kennedy, Louisiana recognizes that for public policy reasons,
[i]t would be self-defeating for society to impose civil liability on a citizen for inaccurately reporting criminal conduct with no intent to mislead. If the risks to the citizen are too high, a fertile field for criminal suppression will have disappeared.
Kennedy, 05-1418 at p. 19, 935 So.2d at 683, citing Arellano v. Henley 357 So.2d 846, 849 (La.App. 4th Cir.1978). Kennedy characterized the reporting of suspected criminal activity to law enforcement officers as speech "of public concern" Id., 05-1418 at p. 9, 935 So.2d at 677, and afforded it the same protection as the First Amendment right to free speech. Id., 05-1418 at p. 10, 935 So.2d at 678. The qualified immunity protection applies whether the speaker is a private individual such as Dr. Villien, or the media.
In Kennedy, the Louisiana Supreme Court adopted the "knowing falsity or reckless disregard for the truth" standard for immunity in cases involving a report to law enforcement officers of suspected criminal activity. The court noted that this strikes
A necessary and appropriate balance between a person's interest in protecting his or her reputation and the need to encourage individuals to report suspected criminal activity to the proper authorities without fear of being exposed to civil liability for honest mistakes. Unless such protection is extended, fear of being exposed to civil liability could discourage individuals from alerting police to suspicious activity, thereby enabling criminals to escape detection and endangering other potential victims. Individuals who engage in behavior beneficial to society should not be penalized by facing exposure to civil liability for mistakes in judgment attributable to simple negligence.
Kennedy, 05-1418 at p. 24, 935 So.2d at 686.
In Kennedy, employees of a fast-food chain mistakenly reported to the police that a customer had paid with a counterfeit bill. As it turned out, conclusively determining whether the bill was counterfeit was quite easy through the use of a special pen-like instrument. The court did not focus on the ease with which the employees' mistake could have been avoided but *570 instead focused on their reasonable belief that the bill was counterfeit.
Mr. Mitchell distinguishes Kennedy because Dr. Villien, unlike the fast-food employees, is a learned person. However, the focus in both cases is not the reporters, lay or learned, but the reporter's belief that he is reporting to proper authority a violation of the law.
The RESTATEMENT (SECOND) OF TORTS § 598 describes the public interest privilege as follows:
An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
(a) there is information that affects a sufficiently important public interest, and
(b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true.
Comment (d) to Section 598 states that the privilege is applicable "when any recognized interest of the public is in danger, including the interest in the prevention of crime and the apprehension of criminals." Id., p. 19, 935 So.2d at 683.
The Kennedy court stated "that the public has an interest in possible criminal activity being brought to the attention of the proper authorities, and have extended a qualified privilege to remarks made in good faith.... (ellipsis for citation of cases) The public policy reasons supporting the extension of such a privilege are succinctly stated in Arellano v. Henley, 357 So.2d 846, 849 (La.App. 4 Cir.1978)." Id. at p. 19, 935 So.2d at 683.
Thus we conclude that Dr. Villien as a mandated reporter cannot have less immunity than the discretionary citizen reporter such as the fast-food employee of Kennedy. The same test applies: that the reporter believed subjectively that he was reporting a crime. "The crucial issue is... [the reporting physician's] subjective belief in making the report." S.G. v. City of Monroe, supra, 843 So.2d at 663. That immunity is harmonious with the immunity provided to physician reporters by Louisiana mandated-reporting statutes which resemble La. R.S. 14:403.5 and have a similar purpose of detecting crime through physician reports to law enforcement authorities. Accordingly, we conclude that because of the mandatory reporting requirements of La. R.S. 14:403.5, Dr. Villien enjoys a qualified or conditional privilege under Kennedy when he reported a suspected gunshot wound if in good faith he had a subjective belief in the accuracy of his report at the time.

V
Having concluded as a matter of law that Dr. Villien enjoys a qualified privilege under the circumstances, we turn to the second step of the inquiry, which is a determination of whether Dr. Villien abused his privilege. The Kennedy court defined the requirements to prove this abuse:
[W]here a conditional privilege is found to exist, the negligence standard that is part of plaintiff's prima facie case is logically subsumed in the higher standard for proving knowing falsity or reckless disregard as to truth or falsity necessary to overcome the privilege, it is of no consequence that he or she might be able to prove the lesser standard of negligence.
Kennedy, 05-1418 p. 28 fn 19, 935 So.2d *571 at 687.[19] The "higher standard" which Mr. Mitchell must meet to establish the abuse of privilege was clearly expressed in Kennedy. To prove reckless disregard, the plaintiff must show that the communication was made despite the reporter's belief that it was probably false. Proof of gross negligence in the communication of a false statement is insufficient to prove reckless disregard. Id.
The court in Kennedy explained that
Conduct which would constitute reckless disregard is typically found where a story is fabricated by the defendant, is the product of his imagination, or is so inherently improbably that only a reckless man would have put it in circulation [citing Trentecosta, 96-2388 at 14, 703 So.2d at 561-62, quoting St. Amant v. Thompson, 390 U.S. at 727, 732, 88 S.Ct. at 1323, 1326, 20 L.Ed.2d 262 (1968)]....[M]ere negligence as to falsity is not sufficient to prove abuse of the privilege, and the failure to investigate a matter fully before contacting police also does not present a jury question on whether a statement was communicated with reckless disregard for the truth.
Kennedy, 05-1418 at p. 30-31, 935 So.2d at 689.[20]
Dr. Villien argues that Mr. Mitchell is unable to show with evidence of sufficient quality and quantity that he abused his privilege. The only evidence which Mr. Mitchell has produced on the issue of abuse of the privilege is the affidavit of Dr. Arnold. Dr. Arnold, an expert emergency room physician, opined that Dr. Villien's report to Det. Hunter was "careless, reckless, and not supported by a proper evaluation at the time." His expert opinion merely supports a finding of negligence, perhaps even gross negligence, on the part of Dr. Villien when he identified the Ms. Hall's wound as a gunshot wound. But, Dr. Arnold's opinion does not address the dispositive issue of whether Dr. Villien communicated the information to the police despite his "belief that it was probably false." Kennedy, supra. Dr. Arnold's evidence cannot support a finding of abuse of privilege.
Moreover, Det. Hunter's testimony describes Dr. Villien as being certain of his diagnosis that the wound was from a gunshot. The contemporaneous medical record prepared by Dr. Villien described the wound as "suggestive of gunshot wound." There is, then, simply no evidence that Dr. Villien believed he was making a report which was probably false and thus no material fact upon which reasonable persons could disagree. Because Mr. Mitchell "fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact." La. C.C.P. art. 966(C)(2). Thus, summary *572 judgment should have been granted on the defamation claim against Dr. Villien.

VI
We turn now to Mr. Mitchell's claim against Dr. Villien for false arrest and imprisonment. "Wrongful arrest, the tort of false imprisonment, occurs when one arrests and restrains another against his will and without statutory authority." Kennedy, 05-1418 at p. 32, 935 So.2d at 690. Kennedy, id. (citing Dumas v. City of New Orleans, 01-0448, p. 2, (La.App. 4 Cir. 12/5/01) 803 So.2d 1001, 1003); Kyle v. City of New Orleans, 353 So.2d 969 (La. 1977).
Dr. Villien argues first that he did not detain Mr. Mitchell. He argues alternatively that the arrest and imprisonment of Mr. Mitchell resulted from the independent and intervening actions of Det. Hunter.
Mr. Mitchell has not submitted any evidence contradicting Dr. Villien's assertions that he did not physically detain or restrain Mr. Mitchell in any way nor did he exercise any control over Mr. Mitchell's movement before or after the arrival of the police at the emergency room. The record is unclear whether Mr. Mitchell was arrested at the emergency room or later at a police station.
While the homicide detectives began a criminal investigation into the death of Ms. Hall which was instigated by the mistaken report of Dr. Villien that she was a victim of a gunshot wound, they did engage in further investigation independent of Dr. Villien's mistaken report. It is true that Det. Hunter in deposition testimony emphasized his reliance upon Dr. Villien's statements to him and testified that he would not have arrested Mr. Mitchell but for Dr. Villien's conclusion. However, Dr. Villien did not participate in any way in the detective's decision whether to arrest Mr. Mitchell or when to arrest him.
Det. Hunter, unassisted by Dr. Villien, conducted his own inspection of the Hall-Mitchell residence, interviewed Mr. Mitchell several times, checked Mr. Mitchell's police record with its entry of domestic violence charges made by Ms. Hall against Mr. Mitchell in the past, and consulted with the coroner in handling the case. It was the police who asked Mr. Mitchell to come to the police station and who held him there until they booked him into parish prison. Importantly, no one testified that Dr. Villien ever identified Mr. Mitchell as the person who shot Ms. Hall.
"An intervening cause is one which comes into play after the defendant's negligent conduct has ceased, but before the plaintiff suffers injury." Adams v. Rhodia, 07-2110 p. 13 (La.5/21/08) 983 So.2d 798, 808, citing RESTATEMENT (SECOND) OF TORTS § 186 (1965); 1 Dan B. Dobbs, The Law of Torts § 186 (2001).[21]
In situations in which there is an intervening force that comes into play to produce the plaintiff's injury (or more than one cause of an accident), it has generally been held that the initial tortfeasor will not be relieved of the consequences of his or her negligence unless the intervening cause superseded the original negligence and alone produced the injury.... If the original tortfeasor could or should have reasonably foreseen that the accident might occur, he or she will be liable notwithstanding the intervening cause. In sum, foreseeable intervening forces are within the scope *573 of the original risk, and hence of the original tortfeasor's negligence.
Adams, id., 07-2100 at p. 14, 983 So.2d at 808 (citations omitted).
In Kennedy the independent actions and investigation of the sheriff broke the chain of causation between the reporter of the crime and the defendant's arrest. See also Adams v. Harrah's, 41,468, p. 4 (La. App. 2 Cir. 1/10/07) 948 So.2d 317, 320; Hughes v. Gulf International, 593 So.2d 776 (La.App. 4th Cir. 1992) (discussing intervening cause for false arrest).
As in Kennedy, in this case it is clear that any chain of causation regarding plaintiff's subsequent detention was broken. The decision to detain plaintiff was made by the independent actions and investigation of the Sheriff's Office. Dr. Villien did not actually or constructively detain Mr. Mitchell. Although his negligence instigated the criminal investigation, it was the independent actions and decisions of Det. Hunter which resulted in the arrest and imprisonment of Mr. Mitchell.
Notably, Dr. Villien was not informed of the definitive official ruling of the coroner based upon an autopsy that Ms. Hall was not a gunshot victim until the filing of this lawsuit. He, therefore, could have played no role in Mr. Mitchell's continued imprisonment despite the coroner's finding.
The claims for wrongful arrest and imprisonment against Dr. Villien should have been dismissed by summary judgment.

VII
Dr. Villien made a mistake in determining that Ms. Hall had been shot. Mr. Mitchell was deprived of his liberty for over a month. At least as between these two parties, the law has decided that Mr. Mitchell for the good of society must bear the cost of Dr. Villien's mistake. Whether Detective Hunter and his employer are liable to him for wrongful arrest and imprisonment is for later resolution in these proceedings.

DECREE
Accordingly, we reverse the trial court's interlocutory judgment denying Dr. Villien's motion for summary judgment, and we render judgment in favor of Dr. Villien and against Christopher Mitchell, dismissing all his claims against Dr. Villien only, with prejudice. We remand the matter for further proceedings against Detective Hunter and the City of New Orleans.
REVERSED, RENDERED AND REMANDED.
ARMSTRONG, C.J., and LOMBARD, J., concur in the result.
ARMSTRONG, C.J., concurs in the result.
I respectfully concur in the result reached in the majority opinion.
NOTES
[1] Mr. Mitchell also named Detective Hunter and his employer, New Orleans Police Department, as defendants in this lawsuit. The claims against them are not before us on this application for supervisory relief.
[2] The trial court, finding that there were material facts at issue, denied the motion. A judgment denying a motion for summary judgment is an interlocutory judgment, which is not appealable. La. C.C.P. art. 968; Barber v. Russell, 08-1366, pp. 1-2 (La.App. 4 Cir. 4/1/09), 9 So.3d 1033, 1034. Dr. Villien timely sought supervisory relief from this court. La. C.C.P. art. 2201, U.R.C.A. 4-3. We initially denied his application, stating: "We have reviewed the application, which did not appear to include all of the evidence the trial court had before it, such as the affidavit of Dr. Thomas C. Arnold. On the showing made, we decline to exercise our supervisory jurisdiction." Mitchell v. Villien, La.App. 4 Cir. No. 08-1470 (12/22/08) (unpublished).

Dr. Villien then sought supervisory relief from the Louisiana Supreme Court. Exhibits were filed in the Supreme Court which had not been submitted to this court, including the affidavit of Dr. Arnold as well as excerpts from the depositions of Amy Davis, a nurse in the emergency room, and Kimberly Johnson, an EMT who had transported Ms. Hall to the hospital. The Supreme Court granted Dr. Villien's writ and remanded to this court for briefing, argument, and opinion. Mitchell v. Villien, 09-121 (La.4/13/09), 5 So.3d 149. We have complied with the Supreme Court's remand order.
[3] No powder burns appeared on the skin around the entry wound, a characteristic of close-range gunshot wounds.
[4] Mr. Mitchell's arrest was not pursuant to a warrant. Det. Hunter was required by La. C. Cr. P. art. 230.2(A) "to complete an affidavit of probable cause supporting the arrest of the person and submit the same to a magistrate." Mr. Mitchell was entitled to a probable cause determination within 48 hours of his arrest.
[5] Second degree murder is a violation of La. R.S. 14:30.1, a felony charge. La. Const. art. 1 § 14 guarantees a person charged with a felony who has not been indicted by a grand jury, a preliminary examination for a judicial determination after an evidentiary hearing whether there is probable cause to believe he has committed the offense and to continue the custodial detention, a bail determination, the institution of criminal charges by the district attorney or a trial. La. C. Cr. P. art. 292 et seq.; State v. Collins, 00-1818, p. 6 (La.App. 4 Cir. 4/11/01), 787 So.2d 391, 395; State v. Wright, 564 So.2d 1269, 1272 (La.App. 4 Cir. 1989).
[6] Dr. Villien did not assign as error the absence of any evidence which contradicted Dr. Villien's assertion that "I never identified Christopher Mitchell to police as the person who shot Cathy Hall."
[7] The two monsters controlling the Strait of Messina (between Calabria and Sicily). Odysseus must navigate his ship between them, knowing that to avoid one means his ship will be attacked by the other. See Homer, Odyssey, Book XII.
[8] We recognize three sets of terms: the source of the protection is either statutory (created by the legislature) or judicial; the designation of the protection is either immunity or privilege; and the procedural way in which to assert it is either by the exception of no cause of action, or by the affirmative defense. Our review shows that there is not uniformity in Louisiana law regarding the two terms. However, on abuse of privilege, the burden of proof falls upon the plaintiff at either stage of the litigation, whether the defendant claims a statutory immunity or a judicially created privilege. In our ruling we consider the terms without distinction to address the issue involving Dr. Villien's status in this case.
[9] La. R.S. 14:403.4(E) states: "No cause of action shall exist against any person who in good faith makes a report pursuant to this Section, cooperates in an investigation by any agency, or participates in any judicial proceeding resulting from such report." The statute was created by Acts 1988, and amended in Acts 1991 and Acts 1997.
[10] La. R.S. 14:403.2 requires reporting of abuse of an adult on pain of imprisonment of not more than six months and/or fine of $500(A). False reporting carries the same penalty (C). La. R.S. 15:1504(A) applies to "Any person, including but not limited to a health, mental health, and social service practitioner"; (B) gives immunity to any person who reports in good faith to an adult protection agency a suspected abuse.
[11] La. Ch. C. art. 611(B) states: "No cause of action shall exist against any person who in good faith makes a report, cooperates in an investigation by an adult protective agency, or participates in judicial proceedings authorized under the provisions of this Chapter, or any adult protective services caseworker who in good faith conducts an investigation or makes an investigative judgment or disposition, and such person shall have immunity from civil or criminal liability that shall otherwise bight be incurred or imposed ... (2) Any person who makes a report known to be false or with reckless disregard for the truth of the report."
[12] La. Ch. C. art. 611A(1)(a) provides immunity for a "[p]erson who in good faith makes a report, cooperates in any investigation arising as a result of such report, or participates in judicial proceedings authorized under the provisions of this Chapter." In contrast, immunity from civil liability is provided to the person who "may" report suspected abuse of an occupant of a nursing home, hospital or other health care provider pursuant to La. R.S. 40:2009.13: "Any person ... who in good faith submits a report pursuant to this Section shall have immunity from any civil liability that otherwise might be incurred or imposed because of such report. Such immunity shall extend to participation in any judicial proceeding resulting from the complaint." (E) The criminal statute, La. R.S. 14:93.3, prohibiting cruelty to the infirm or an occupant of a nursing home, hospital or other facility, has no provision for immunity for a reporter.
[13] Both cases involved physicians' reporting of suspected child molestation.
[14] Opinion 5.05-Confidentiality states: "The information disclosed to a physician by a patient should be held in confidence. The patient should feel free to make a full disclosure of information to the physician in order that the physician may most effectively provide needed services.... The physician should not reveal confidential information without the express consent of the patient, subject to certain exceptions which are ethically justified because of overriding considerations." (Issued December 1983, updated June 1994 and June 2007).
[15] "A Physician S[sic]hall respect a patient's right to confidentiality. It is ethical to disclose confidential information when the patient consents to it or when there is a real and imminent threat of harm to the patient or to others and this threat can be only removed by a breach of confidentiality." The physician's oath includes: "I will respect the secrets that are confided in me, even after the patient has died." Code of Ethics, updated 14.10.2006.
[16] But see La. R.S. 40:1300.14, regarding HIV test results, Section E listing conditions when "a physician may disclose confidential HIV test results." The statute includes no penalty.

La. R.S. 40:1062 makes it unlawful for one person to infect another person in any manner with a venereal disease; and La. R.S. 40:1065, regarding reporting of venereal disease, for which § 1068 imposes a penalty of $10 to $200 (first offense), $25-$400 (second offense) and $50-$500 or prison for 10 days to 6 months or both.
[17] Alaska, California, Colorado, Delaware, District of Columbia, Idaho, Illinois, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Utah, Virginia, West Virginia, and Wisconsin give immunity from civil and criminal liability to physicians and other healthcare workers who report bullet wound injuries in compliance with state law. See Appendix A.
[18] Our review of similar statutes in the other states shows that 24 states (plus the District of Columbia) provide immunity by statute for physicians reporting firearm-caused injuries; of the other states which have reporting statutes, 18 in addition to Louisiana, have no immunity provision. Alabama, Georgia, Nebraska, New Mexico, Oklahoma, Washington, and Wyoming have no statute pertaining to firearms; however, Nebraska Rev. St. 28-209, requires reporting of wounds or injuries of violence. See Chart, Appendix A. See also "Summary of Laws Relevant to the Mandatory Reporting of Domestic Violence When the Victim Is A Competent Adult," NCPVAW at APRI (2006), ncpvaw@ndaa-apri.org.; Anderson v. Little & Davenport Funeral Home, Inc., 242 Ga. 751, 251 S.E.2d 250, 252-53 (1978); O'Heron v. Blaney, 276 Ga. 871, 583 S.E.2d 834 (2003); Schmidt v. Mahoney, 659 N.W.2d 552, 555-56 (S.Ct.Iowa, 2003); Sikorski v. Johnson, 2008 WL 4184728 (Dist. Ct. Montana 2004); Brandt v. Medical Defense Assoc., 856 S.W.2d 667 (Mo., 1993), 856 S.W.2d 667; People v. Kucharski, 346 Ill. App.3d 655, 282 Ill.Dec. 386, 806 N.E.2d 683 (2 Dist.2004); State v. Baptist Mem. Hosp.-Golden Triangle, 726 So.2d 554 (Miss.1998); People v. Traylor, 145 Mich.App. 148, 377 N.W.2d 371 (1985); Freeman v. State, 258 Ark. 617, 527 S.W.2d 909 (1975).
[19] See RESTATEMENT (SECOND) OF TORTS § 600 cmt. B, which states, "[M]ere negligence as to falsity ... is no longer treated as sufficient to amount to abuse of a conditional privilege. Instead, knowledge or reckless disregard as to falsity is necessary for this purpose.... Reckless disregard as to truth or falsity exists when there is a high degree of awareness of probable falsity or serious doubt as to the truth of the statement."
[20] See Trentecosta, supra, Traylor, J., dissenting, stating: "The burden of proving `actual malice' requires a plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." [citations omitted, emphasis in original] ... "The focus should instead be whether Officer Smith seriously doubted the truth of his statement concerning the plaintiff. Because the plaintiff has not proved by clear and convincing evidence that Officer Smith made his statement with actual malice ... the plaintiff should not prevail." 703 So.2d at 565-66.
[21] The Law of Torts by Dan B. Dobbs is the successor treatise to Prosser and Keaton's Law of Torts.